IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MY FAV ELECTRONICS, INC. d/b/a SECOND LIFE MAC<br><br>                         Plaintiff,<br>        v.<br><br>PAULA B. CURRIE,<br><br>and<br><br>MEGAN FINNEGAN-RATLIFF,<br><br>                         Defendants. | Case No. 1:24-cv-01959 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, My Fav Electronics, Inc. d/b/a Second Life Mac ("Plaintiff" or "SLM"), for its Complaint against Paula B. Currie ("Currie") and Megan Finnegan-Ratliff ("Ratliff") (collectively the "Former Officers" or "Defendants"), states as follows:

**INTRODUCTION**

1.      This is an action filed by SLM against two of its former Officers, Currie and Ratliff, for Breach of Fiduciary Duties (Counts I and II), Misappropriation of Trade Secrets under 18 U.S.C. §1836 (Counts III and IV), Misappropriation of Trade Secrets under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (Counts V and VII), Misappropriation of Trade Secrets under the Ohio Uniform Trade Secrets Act, RC 1333.61, *et seq.* (Counts VI and VIII), Civil Conspiracy (Count IX), Breach of Contract (Counts X-XIII), and Spoliation of Evidence (Count XIV). While serving as SLM's Officers, Currie and Ratliff stole massive amounts of SLM's most sensitive confidential information and trade secrets for the purpose of giving one of SLM's direct

competitors an unfair competitive advantage over SLM to the severe financial detriment of SLM. In doing so, Currie and Ratliff egregiously breached their fiduciary duties to SLM, violated federal and state trade secret law, and breached multiple contractual obligations. SLM seeks, among other forms of relief, a multi-million dollar monetary award in consequential, exemplary, and punitive damages; the attorneys' fees and costs it incurs in bringing this lawsuit; and preliminary and permanent injunctive relief.

## PARTIES

2.      SLM is, and all times material hereto was, an Illinois corporation with its principal place of business in Skokie, Illinois, and it is licensed and authorized to do business in, among other states, Illinois.

3.      Currie is, and at all times material hereto was, a resident of Powell, Ohio.

4.      Ratliff is, and at all times material hereto was, a resident of Columbus, Ohio.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §1332(a)(1), as Plaintiff and Defendants are of diverse citizenship, and the amount in controversy exceeds $75,000.

6.      This Court also has subject matter jurisdiction over this matter because it raises a federal question under the Defend Trade Secrets Act of 2016, 18 U.S.C. §1831, *et seq*. In addition, the Court has supplemental jurisdiction over SLM's state law claims pursuant to 28 U.S.C. §1367.

7.      Venue is proper in the Northern District of Illinois under 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this District.

8.      This Court has personal jurisdiction over Defendants.

9.    Currie was employed by SLM pursuant to that certain Non-Disclosure Agreement dated April 24, 2019 (the "Currie Employment Agreement"), which contains an Illinois choice-of-law provision. (A true and authentic copy of the Currie Employment Agreement is attached hereto as **Exhibit A**.)

10.    Ratliff was employed by SLM pursuant to that certain Employment Agreement dated December 23, 2019 (the "Ratliff Employment Agreement"). (A true and authentic copy of the Ratliff Employment Agreement is attached hereto as **Exhibit B**.) The Ratliff Employment Agreement mandates venue in this District and the application of Illinois law: "Venue/Jurisdiction. This Agreement shall be governed by the laws of the State of Illinois. Any litigation that may be brought by either party involving the enforcement of this Agreement or the rights, duties, or obligations of this Agreement, shall be brought exclusively in the state or federal courts sitting in Chicago, Illinois." (Ratliff Employment Agreement, §3.6.)

11.    Both Currie and Ratliff traveled to SLM's Illinois headquarters on many occasions during their tenures with SLM. Both Currie and Ratliff regularly used and leveraged SLM's Illinois-based personnel and resources to use and generate SLM's confidential and trade secret information in connection with their pursuit of sales commissions for their own personal benefit. All of the Apple devices procured by SLM through Currie's and Ratliff's sales activities were processed in and resold from SLM's Illinois location. Currie also had her own office cube in Illinois and had specific contacts with SLM's existing and prospective customers in Illinois.

## FACTUAL ALLEGATIONS

### SLM and its Primary Direct Competitor, Diamond Assets, LLC

12.    Founded in 2012, SLM is an industry-leading Apple device buyback partner. SLM disrupts the device buyback industry by coupling the best Apple lifecycle expertise with

outstanding customer service, start to finish custody of devices, and the most transparent sellback process. SLM's Apple expertise and experience is unmatched, with more than $1 billion in Apple sales.

13.     SLM partners with schools and enterprises to create sustainable technology budgets by purchasing their pre-owned Apple devices. The income organizations receive for their aging devices can be used to invest in new technology. Devices are evaluated, data is securely erased to Department of Defense standards, and they are resold via wholesale and retail channels.

14.     SLM's most significant direct competitor is Diamond Assets, LLC ("Diamond Assets"), which touts itself as "one of the largest and long-standing Apple buyback partners." https://diamondassets.com/about/ (accessed on March 7, 2024). SLM and Diamond Assets often compete head-to-head on procurement opportunities, particularly in the Education buyback market. Diamond Assets is such a significant competitor of SLM that it is specifically identified at the top of the list of competitors in its non-competition agreement, as explained in more detail below.

<u>SLM's Trade Secrets, Proprietary Information, and Confidential Information</u>

15.     SLM deploys substantial resources at significant expense to identify prospective customers from tens of thousands of enterprises, public schools, and private schools. By way of example, SLM's Procurement Department devotes significant resources to "cold calling" prospective customers and educating their technology directors about the Apple device buyback process, cycles, and how they can successfully recycle their Apple devices and replace them with new Apple devices while meeting budgetary goals.

16.     SLM also identifies prospective customers by developing cross-referral relationships with Apple sales representatives. Specifically, SLM refers its customers to Apple

sales representatives with whom they have a relationship for purposes of the customer purchasing new devices from Apple. The Apple sales representatives, in turn, refer enterprises and schools to whom they are selling new Apple devices to SLM. SLM then partners with the prospective customer to purchase their pre-owned devices.

17.     In addition, SLM identifies prospective customers through its participation in industry trade shows, which can cost in excess of $100,000, depending on the show.

18.     The identities of the key decisionmakers responsible for Apple buyback programs at customers and prospective customers also constitute confidential and competitively valuable information. It can take years for SLM to develop a relationship with a prospective customer before the key decisionmakers are identified and a SLM salesperson interacts directly with them.

19.     The Apple buyback industry is highly competitive, and SLM devotes significant financial resources to its sales and marketing strategies to identify prospective customers and retain existing customers for repeat business opportunities for their next Apple device buyback cycle. These strategies include the creation and development of detailed "win/loss" records for past opportunities broken down by, among other things, territory, vertical market, and competitors. These strategies inform SLM's dynamic and ongoing adjustments necessary to compete in this industry, such as adjusting by sales territory, sales headcounts, pricing, and marketing budgets in order to maximize revenues and profits.

20.     SLM proposals comprise a combination of pricing and services. SLM's proposals are tailored to the particular opportunity, taking into consideration a variety of factors, including,

by way of example only, the size of the opportunity and the prospect of repeat business, the known competitors involved and their strengths/weaknesses, and sales territory-specific considerations.

21.     SLM also convenes an annual three-day meeting with its Leadership Team, during which SLM leadership discusses a variety of strategic topics, including strategic priorities, SLM's strengths and weaknesses in the market, SLM's strategic threats, personnel decisions (including plans to add or subtract headcount in certain departments and territories), base salary and incentive compensation-related decisions, sales territory realignments, budget issues, operational strengths and weaknesses, marketing plans, and employee training. The Leadership Team's most confidential and strategic reflections, initiatives, and business plans are recorded on large "flip charts" throughout the three-day annual meeting and photographed for later use by the Leadership Team. The distribution of the photographs of the flip charts were limited to SLM's Leadership Team, consisting of only SLM's Chief Executive Officer, Chief Operating Officer, Vice President of Finance, Director of Marketing, Director of People, and Currie (as Vice President of Procurement).

22.     SLM's confidential and trade secret information includes, but is not limited to: (a) Customer/Prospect Information: the identities of certain of SLM's customers, prospective customers, customer contacts/key decisionmakers, prospective customer contacts/key decisionmakers, the unique preferences and needs of SLM's customers and prospective customers, and the terms and conditions of SLM's historical relationships with its customers, including volume, pricing, services, and payment terms; (b) Referral Sources: the identities of SLM's referral sources and their unique preferences; (c) Marketing Strategies: SLM's marketing strategies, including existing and prospective customer-specific marketing strategies, territory-specific marketing strategies, and related information; (d) SLM's Future Business Plans: SLM's

customer targets, business plans, and strategic threats; (e) <u>Pricing, Sales, and Profit Margin Information</u>: SLM's profit margins, pricing strategies, pricing practices, sales practices, and similar information; and (f) <u>Personnel Information</u>: personnel training materials and information, base compensation, incentive compensation plans, and employee-specific compensation information. The confidential and trade secret information identified in this paragraph may be referred to in this Complaint as "<u>Confidential Information</u>."

23.     SLM has spent, and continues to spend, substantial financial resources creating and compiling its Confidential Information. If misappropriated, SLM's Confidential Information would enable a competitor to harm SLM's business interests, and/or to use SLM's Confidential Information to gain an unfair competitive advantage over SLM in competing for SLM's existing and prospective customers.

24.     SLM takes appropriate steps to guard its Confidential Information, including, without limitation, its practices of requiring its employees, including former officers Currie and Ratliff, to sign agreements that include provisions relating to non-disclosure/non-use of its Confidential Information during employment and thereafter, requiring the return of all Confidential Information upon separation from employment, and, for certain positions, reasonable restrictions on solicitation of SLM's customers, prospective customers, and employees, among other provisions; limiting access to its databases containing sensitive, competitively valuable business information to those with a legitimate business reason to access such information through the use of password protection; provisions in its employee handbook directing employees to maintain confidentiality with respect to SLM's documents and information; use of a firewall network security system and multi-factor authentication; limiting access to its offices to employees to whom keycards have been issued with the capability to monitor each instance of keycard use;

the use of an on-site document shredding machine for purposes of destroying confidential information; termination of employee access to SLM's computer systems and servers promptly upon separation of employment (or earlier, when there is a perceived threat); collecting Company property, including laptops and tablets, from separating employees; and including the following statement, or similar language, on its customer proposal template:

> This Purchase and Sale Agreement (this "Agreement") and the information contained is strictly confidential and may not be shared or distributed to any third party, in whole or part, without Second Life Mac's express written permission.

Currie's Employment
with SLM and Contractual Commitments

25.     On or about April 1, 2019, SLM hired Currie as its Vice President of Procurement. In this position, Currie was responsible for, among other things, the management and development of SLM's team of sales executives throughout the United States; the identification and strategic pursuit of prospective customers; the development of long-term customer relationships; the development of long-term referral relationships with Apple sales representatives; and the development of nationwide sales strategies, procurement proposals, quotas, territory alignments, forecasting, and budgeting, both individually and in cooperation with SLM's Leadership Team.

26.     Throughout her tenure with SLM, Currie had access to the Confidential Information, including confidential documents drafted and developed by SLM using its Confidential Information, such as notes and strategy memoranda regarding how to best sell and "pitch" prospective customers, sales territory maps, pricing, marketing overviews regarding specific vertical market groups, notes and strategy memoranda regarding how to best sell and "pitch" each vertical market group, personnel planning and compensation information, and other competitive analyses and tools developed using SLM's Confidential Information.

27.     In consideration of her salary, incentive compensation, and other benefits of employment with SLM, and as a condition of her employment with SLM, Currie signed the Currie Employment Agreement, in which she promised not to use or disclose, directly or indirectly, any of SLM's confidential or trade secret information for any purpose other than for the performance of her duties for SLM, and to return the same (along with any other property of SLM) to SLM upon request:

> Employee will perform services for My Fav Electronics INC that may require My Fav Electronics INC to disclose confidential and proprietary information ("Confidential Information") to Employee. (Confidential Information is information and data of any kind concerning any matters affecting or relating to My Fav Electronics INC, the business or operations of My Fav Electronics INC, and/or the products, drawings, plans, processes, or other data of My Fav Electronics INC not generally known or available outside of the company.)

> Accordingly, to protect the Confidential Information that will be disclosed during employment, the Employee agrees as follows:

> Employee will hold the Confidential Information received from My Fav Electronics INC in strict confidence and will exercise a reasonable degree of care to prevent disclosure to others.

> Employee will not disclose or divulge either directly or indirectly the Confidential Information to others unless first authorized to do so in writing by My Fav Electronics INC management.

> Employee will not reproduce the Confidential Information nor use this information commercially or for any purpose other than the performance of his/her duties for My Fav Electronics INC.

> Employee will, upon request or upon termination of his/her relationship with My Fav Electronics INC, deliver to My Fav Electronics INC any drawings, notes, documents, equipment, and materials received from My Fav Electronics INC or originating from employment with My Fav Electronics INC.

(Exhibit A.)

Ratliff's Employment
with SLM and Contractual Commitments

28.     In March 2019, SLM hired Ratliff as a Director of Procurement, and on or about October 1, 2023, SLM promoted Ratliff to the position of Regional Vice President (East) of Procurement. In this position, Ratliff was responsible for, among other things, the management and development of a sales team consisting of three regions and four direct reports for 26 states; the identification and strategic pursuit of prospective customers; the development of long-term customer relationships; the development of long-term referral relationships with Apple sales representatives; and the development of nationwide sales strategies, procurement proposals, quotas, territory alignments, forecasting, and budgeting, both individually and in cooperation with Currie and other members of the Leadership Team.

29.     Throughout her tenure with SLM, Ratliff had access to the Confidential Information, including confidential documents drafted and developed by SLM using its Confidential Information, such as notes and strategy memoranda regarding how to best sell and "pitch" prospective customers, sales territory maps, pricing, marketing overviews regarding specific vertical market groups, notes and strategy memoranda regarding how to best sell and "pitch" each vertical market group, personnel planning and compensation information, and other competitive analysis and tools developed using SLM's Confidential Information.

30.     In consideration of her salary, incentive compensation, and other benefits of employment with SLM, and as a condition of her employment with SLM, Ratliff promised in the Ratliff Employment Agreement, among other things, not to use or disclose any of SLM's confidential or trade secret information for her own benefit or for the benefit of anyone other than SLM, both during and after her employment with SLM, and to return the same to SLM at the end of her employment:

Company Property. All written materials, records, data, and other documents prepared or possessed by Employee during Employee's employment with the Company are the Company's property. All information, ideas, concepts, improvements, discoveries, and inventions that are conceived, made, developed, or acquired by Employee individually or in conjunction with others during Employee's employment (whether during business hours and whether on the Company's premises or otherwise) which relate to the Company's business, products, or services are the Company's sole and exclusive property. All memoranda, notes, records, files, correspondences, drawings, manuals, models, specifications, computer programs, maps, and all other documents, data, or materials of any type embodying such information, ideas, concepts, improvements, discoveries, and inventions are the Company's property.

At the termination of Employee's employment with the Company for any reason, Employee shall return all of the Company's documents, data, or other Company property to the Company.

Confidential Information / Non-Disclosure. Employee acknowledges that the business of the Company is highly competitive and that the Company has provided and will provide Employee with access to Confidential Information relating to the business of the Company. "Confidential Information" means and includes the Company's confidential and/or proprietary information and/or trade secrets that have been developed or used and/or will be developed and that cannot be obtained readily by third parties from outside sources. Confidential Information includes, by way of example and without limitation, the following: information regarding customers, employees, contractors, and the industry not generally known to the public; strategies, methods, books, records, and documents; technical information concerning products, equipment, services, and processes; procurement procedures and pricing techniques; the names of and other information concerning customers (such as contact name, service provided, pricing for that customer, amount of services used, credit and financial data, and/or other information relating to the Company's relationship with that customer); pricing strategies and price curves; plans and strategies for expansion or acquisitions; budgets; customer lists; research; financial and sales data; trading terms; evaluations, opinions, and interpretations of information and data; marketing and merchandising techniques; prospective customers' names and marks; electronic databases; computer programs; internal business records; contracts benefiting or obligating the Company; bids or proposals submitted to any third party; technologies and methods; training methods and training processes; organizational structure; salaries of personnel; payment amounts or rates paid to consultants or other service providers; and other such confidential or proprietary information. Employee acknowledges that this Confidential Information constitutes a valuable, special, and unique asset used by the Company in their business to obtain a competitive advantage over their competitors. Employee further acknowledges that protection of such Confidential Information against unauthorized disclosure and use is of critical importance to the Company in maintaining their competitive position.

> Employee also will have access to, or knowledge of, Confidential Information of third parties, such as actual and prospective customers, suppliers, partners, joint ventures, investors, financing sources and the like, of the Company. Employee agrees that Employee will not, at any time during or after Employee's employment with the Company, make any unauthorized disclosure of any Confidential Information of the Company, or make any use thereof, except in the carrying out of his or her employment responsibilities hereunder. Employee also agrees to preserve and protect the confidentiality of third-party Confidential Information to the same extent, and on the same basis, as the Company's Confidential Information.

(Ratliff Employment Agreement, §§2.1, 2.2.)

31. Ratliff further promised in her Employment Agreement that, during her employment with SLM and for a period of one (1) year after her last day of employment with SLM (i.e., February 10, 2024, through February 9, 2025), she would not accept employment with, and/or provide services for, certain specified competitors in any capacity, including SLM's most significant direct competitor, Diamond Assets, that is the same or substantially similar to her role with SLM during the twelve (12) months preceding her last day of employment with SLM:

> Non-Compete. Employee acknowledges that the Company is providing Employee with access to Confidential Information. In order to protect the Confidential Information and the Goodwill described above, and in consideration for Employee's receiving access to this Confidential Information and use of this Goodwill, and receiving other compensation provided in this Agreement, including but not limited to the signing bonus provided in Section 1.4 of the Agreement, the Company and Employee agree that, during Employee's employment and for twelve (12) months after termination of employment for any reason, Employee will not accept employment with, and/or provide services for, the following companies in any capacity that is the same or substantially similar to Employee's role with the Company during the twelve (12) months preceding Employee's termination:
>
> Diamond Assets
>
> . . . .

(Ratliff Employment Agreement, §2.4.)

32. Ratliff also promised in her Employment Agreement that, during her employment with SLM and for a period of two (2) years after her last day of employment with SLM (i.e., February 10, 2024, through February 9, 2026), she would not, directly or indirectly, for herself or

for others, work with, call on, service, or solicit or accept competing business from customers or

prospective customers of SLM:

> 2.5    Non-Solicitation of Customers. Employee acknowledges that the Company is providing Employee with access to Confidential Information and that he/she is benefiting from Goodwill. In order to protect the Confidential Information and the Goodwill described above, and in consideration for Employee's receiving access to this Confidential Information and use of this Goodwill, and receiving other compensation provided in this Agreement, including but not limited to the signing bonus provided in Section 1.5 of the Agreement, the Company and Employee agree that, during Employee's employment and for twenty-four (24) months after termination of employment for any reason, Employee will not, directly or indirectly, for Employee or for others, work with, call on, service, or solicit or accept competing business from customers or prospective customers of the Company, whom Employee, within the previous twelve (12) months: (i) had or made contact with, or (ii) had access to information and files about. "Prospective Customer" is defined as any entity that the Company, within the previous twelve (12) months, made a written proposal to perform services, sell products, or engage in any other financial relationship in which Employee was in any way connected, participated, or had knowledge.

> Employee understands that the foregoing restrictions may limit his/her ability to engage in certain activities during the period provided for above, but he/she acknowledges that these restrictions are necessary to protect the Company's Confidential Information, Goodwill, and relationships with actual and prospective customers. Employee agrees that this provision defining the scope of activities constituting competition with the Company is narrow and reasonable because Employee is free to seek employment with other companies providing services that directly or indirectly compete with the business of the Company, except those identified in Section 2.4, so long as Employee does not work with or call on actual or prospective customers as provided above. Thus, this restriction on Employee's ability to compete does not prevent Employee from using and offering his/her skills and only prevents him/her from using and offering the Confidential Information and Goodwill that the Company has provided him.

(Ratliff Employment Agreement, §2.5.)

33.    In addition, Ratliff promised in her Employment Agreement that, during her

employment with SLM and for a period of one (1) year after her last day of employment with SLM

(i.e., February 10, 2024, through February 9, 2025), she would not, directly or indirectly, solicit or

induce any SLM employee to leave their employment with SLM:

Non-Solicitation of Employees. The Company and Employee agree that, during Employee's employment and for twelve (12) months after termination of employment for any reason, Employee will not, directly or indirectly, for Employee or for others, call on, solicit, or induce any other individual that was an employee of the Company at any time during the twelve (12) months preceding Employee's termination, to terminate his or her employment, and will not assist any other person or entity in such a solicitation. The restrictions in this Section 2.6 shall not limit Employee's then-current employer from hiring any individual that responds to a general job posting or employment solicitation that is not targeted at the Company's employees.

(Employment Agreement, §2.6.)

<u>Diamond Asset's Hiring of Currie and the</u>
<u>Former Officers' Theft of SLM's Confidential Information</u>
<u>and Other Egregiously Disloyal Conduct Prior to Their Resignations</u>

34.     Unbeknownst to SLM at the time, on January 22, 2024,[1] Currie executed an offer letter and employment agreement with SLM's most significant direct competitor, Diamond Assets, to become its new Senior Vice President of Procurement, Education, with an anticipated start date of February 5. As the Senior Vice President of Procurement, Education, Currie would be assuming the highest-ranking Officer position for Procurement in the Education industry.

35.     On January 26 (the "<u>Resignation Notice Date</u>") Currie and Ratliff submitted their resignations with a February 9, effective date – four days *after* Currie was to begin working for Diamond Assets.

36.     Unbeknownst to SLM at the time, during the weeks and months leading up to her resignation, Currie had emailed from her SLM work email account to her personal Gmail account, downloaded from SLM's Google Drive account, and/or downloaded from SLM's Salesforce database, a massive amount of SLM's most competitively valuable, confidential and trade secret information, including, without limitation, highly sensitive documents comprising each category of Confidential Information described above (collectively, the "<u>Stolen Information</u>").

---

[1] Unless otherwise noted, all dates hereinafter refer to calendar year 2024.

37.     The Stolen Information includes, without limitation, detailed account information from Salesforce and other SLM databases for *every single* SLM account; detailed historical and current pricing information; detailed 2024 strategic plans relating to targeted industry/ geographic expansion, detailed sales forecasting information, and data showing progress against the same; "win/loss" reports for SLM customers and prospective customers, broken down by territory, state, and account executive; numerous screenshots of the flip charts from SLM's most recent three-day Annual Meeting reflecting the collective leadership's most sensitive ideas concerning SLM's strengths, weaknesses, strategic threats, and strategic planning; SLM's proprietary employee training materials, job descriptions, and employee compensation data; the identities of customers and prospective customers attending in-person sales pitches; the identities and contact information of key decisionmakers of customers and potential customers; and information concerning customers' and potential customers' needs and preferences.

38.     Currie's theft of the Stolen Information was clearly wrongful and part of her scheme to use SLM's confidential and trade secret information in order to give Diamond Assets an unfair competitive advantage in the marketplace with her admitted "partner in crime" (see explanation below), Ratliff. Indeed, the vast majority of the above-described theft occurred during the two-week period preceding the Resignation Notice Date. For example, on Saturday, January 20, Currie downloaded from SLM's Google Drive database 10 files containing a substantial amount of the Stolen Information, and from January 20 through her Resignation Notice Date (January 26), Currie emailed to her personal email account dozens of other files also containing massive amounts of the Stolen Information.

39.     Lest there be any doubt regarding Currie's nefarious intentions, Currie *directly assisted Diamond Assets in competing with SLM while she was still serving as SLM's Vice*

*President of Procurement*. Specifically, in December 2023 and January 2024, SLM was competing head-to-head with Diamond Assets with respect to three school district opportunities (the "School District Opportunities"). During this time period, while serving as SLM's Vice President of Procurement, Currie disclosed to Diamond Assets' Chief Executive Officer, Diamond McKenna ("McKenna"), SLM's confidential proposals, including pricing information, to these school districts.

40.     As noted above, McKenna hired Currie as its highest-ranking Officer for Procurement in Education on January 22, notwithstanding her knowledge of Currie's willingness to freely share with her SLM's confidential and trade secret information while still serving as SLM's highest-ranking Officer for Procurement in Education.

41.     Two of the School District Opportunities were subsequently awarded to Diamond Assets over SLM.

42.     The Stolen Information also included information relating to SLM's active pursuit of other specific opportunities that had taken SLM years to develop. For example, SLM had been pursuing a large unified school district for several years at substantial expense to SLM through a variety of marketing efforts. Through its pursuit of this unified school district over an extended period of time, SLM identified their specific needs and the key decisionmakers for Apple buyback programs. On January 20, Currie sent an email to the salesperson responsible for this breakthrough, saying "Great work yesterday and incredible job getting us to this point. PHENOM!" Two days later on January 22 – the same day Currie signed her offer letter and employment agreement with Diamond Assets – Currie forwarded an email from her SLM work email address to her personal Gmail account with detailed information regarding the opportunity and the work email addresses for the school district's five key decisionmakers for the opportunity.

43.     During this time period, Currie also emailed to her personal Gmail account and to her spouse, Michael Currie, Esq. ("Counsel Currie"), privileged communications between SLM's legal counsel and SLM concerning a non-competition dispute involving a former employee of Diamond Assets.

44.     Currie's admitted "partner in crime," Ratliff, also downloaded SLM's Confidential Information directly from SLM's Salesforce database. On January 25, the day before she submitted her notice of resignation to SLM, Ratliff downloaded a report of all open SLM opportunities for SLM's entire *West* Sales Territory, including every account name, the quantities and types of Apple devices, the value of the opportunity, and other detailed information. These opportunities are worth millions of dollars, and as the Regional Vice President of SLM's *East* Sales Territory, Ratliff had no legitimate reason to download this highly sensitive information concerning SLM's *West* Sales Territory other than to assist Diamond Assets or another SLM competitor in unfairly competing against SLM for these opportunities to the severe financial detriment of SLM.

45.     Just as troubling, in or around late January, Ratliff purchased a 2 Terabyte External Hard Drive. Upon information and belief, Ratliff purchased this hard drive for purposes of copying SLM's Confidential Information in anticipation of joining Currie at SLM's direct competitor, Diamond Assets. This belief is based, in part, on the following facts:

   a)   Ratliff sent a text message to an acquaintance on January 27 – the day after the Resignation Notice Date – stating, in pertinent part: "i [sic] quit my job yesterday, long story b*ut im [sic] trying to get everything loaded off my computer before they shut me down. . . .*" (Emphasis added.)

   b)   The same day (January 27), in a group chat with Currie, Ratliff, Currie's adult son, and Counsel Currie, the following individuals sent the following messages:

<u>Ratliff</u>: "Your mom and wife is [sic] a badass . . . so damn proud of her!! 🙌🙌🙌🙌🙌"

<u>Currie</u>: "And so is my partner in crime! We made it happen *and now we go blow up DA [Diamond Assets]!*" (Emphasis added.)

<u>Currie's Adult Son</u>: "Proud of you two!!!"

<u>Counsel Currie</u>: Let the good times roll!

c) On January 31, Ratliff sent a text message to an acquaintance: ". . . but I did [quit my job], so did Paula [Currie], she's going to build out another company *and I'm going with her* 😂😂." (Emphasis added.)

46. Ratliff engaged in other serious misconduct while serving as SLM's Officer and drawing a substantial salary. For example, SLM had been pursuing a large university for two years at significant expense and through a variety of marketing efforts. On January 16, the university sent an email to Ratliff stating, in part, "I just wanted to let you know that we finally have approval to move forward!"

47. SLM monitors each of its sales opportunities in Salesforce, a database that tracks, among other information, the Stage History of each opportunity (e.g., Potential Lead, Engagement, Negotiation), the Amount of the opportunity expressed in dollars, the estimated Probability of closing the opportunity, the name of the employee who modifies any of these fields within Salesforce, and the date the field was modified. Prior to the university sending the January 16 email to her, Ratliff had listed the Stage of the opportunity as "Negotiation" with a 75% Probability of closing (i.e., above Potential Lead/10% Probability and Engagement/50% Probability).

48. However, upon receiving the January 16 email from the university about finally "moving forward," on January 19, Ratliff downgraded this opportunity to only a "Potential Lead" with just a 10% Probability of closing in a clear attempt to reduce the visibility of this opportunity

to the SLM sales team following her departure. Then on January 25 – the day before she tendered her resignation to SLM and began a two-week vacation through the February 9 effective date of that resignation – Ratliff sent an email to the university contact stating, in relevant part, "I am off the next two weeks so please call me on my cell 614-462-[XXXX] and we will get it going."

49.     Ratliff did not notify the salesperson who would be succeeding her in respect of this opportunity of her above-described modification of the Salesforce entries or her email asking the university to call her cell phone after her vacation (when she would no longer be employed by SLM). Ratliff took these disloyal actions while serving as SLM's Officer for the purpose of reducing the likelihood of SLM closing this opportunity.

50.     Moreover, unbeknownst to SLM at the time, Ratliff had solicited one of SLM's Directors of Procurement in December 2023 to leave SLM with her and Currie to join Diamond Assets, in clear breach of the Ratliff Employment Agreement's employee non-solicitation clause. (Ratliff Employment Agreement, §2.6.)

<u>The Former Officers' Use of Their Corporate Credit Cards for Personal Expenses</u>

51.     SLM provided each of the Former Officers with a company credit card. As a condition of this privilege, Currie and Ratliff each signed a Corporate Credit Card Use Agreement, which provides, in relevant part:

1.  I understand this Card is Company property and I will be making financial commitments on behalf of the Company when using this Card. I agree that use of this Card is limited to business purposes authorized by the Company. I agree this Card must not be used for any personal, unauthorized, or illegal charges and any such misuse will result in cancellation of this Card and may further result in disciplinary action up to and including termination of my employment.

2.  I understand the Company may review and investigate use of this Card and I have no expectation of privacy concerning any charges incurred. I will cooperate with any such review or investigation. I agree to be held personally liable for the total dollar amount of any improper charges incurred plus any administrative fees assessed in connection with misuse of this Card. I agree that any personal, unauthorized, or illegal charges made by me, including any

administrative fees and/or finance charges assessed in connection with such charges, and paid for by the Company on my behalf will be considered a personal loan to be repaid through payroll deduction. I understand that payroll deduction on my loan will be subject to the limits set forth by applicable law. If such deductions are not permitted by law or are insufficient to fully reimburse the Company, I will repay the Company these amounts plus finance or other charges due in connection with the misuse of this Card and the Company may take appropriate legal action to collect the monies owed. If the Company is required to take legal action to collect monies owed under this Agreement, I agree to pay the Company's expenses, including attorney's fees, incurred in its collection efforts. I agree that I may be liable for improper charges that result from allowing others to use this Card.

3. I agree to reconcile my expenses and timely submit an expense report from which the Company will pay the charges incurred in connection with this Card. The expense report will be submitted using the Company's standard expense reporting system and shall be supported by appropriate documentation as required by the Company. If I fail to timely submit accurate and complete expense reports, the Company will consider the unsupported charges incurred in connection with this Card to be a personal loan and may collect those amounts from me as described herein. . . . .

(True and authentic copies of the Corporate Credit Card Use Agreements signed by Currie and Ratliff are attached hereto as **Exhibit C**, and **Exhibit D**, respectively.)

52.     While employed by SLM, Currie engaged in scheme of using her SLM corporate credit card to book business travel on United Airlines, canceling those trips in exchange for United Airline flight credits, and then using those SLM-funded credits for personal travel for herself and her family.

53.     On January 20, just two calendar days before Currie signed her Diamond Assets offer letter and employment agreement with a February 5 anticipated start date, Currie charged $539 to her corporate credit card for an annual WiFi subscription for her United Airlines account to begin *after* her February 5 start date with Diamond Assets.

54.     On January 22, the day she signed her Diamond Assets offer letter and employment agreement, Currie charged $98.95 to her corporate credit card for a delivery of flowers to Ratliff, with the recipient listed as "Best Friend," and the message, "Love you! Paula."

55.     On January 16, Ratliff charged $125 to her corporate credit card for a Nordstrom gift card which she claimed was for another SLM employee. However, Ratliff redeemed the gift card value herself with a purchase from Nordstrom.

56.     On January 31, Ratliff sent a message to a friend referring to a "fuck you present to Scott [Pauga] who owned the company to myself." Upon information and belief, Ratliff is referring to her purchase from Nordstrom using the gift card she charged to SLM on her corporate credit card.

### The Former Officers' Rejection of SLM's Demand for the Inspection of Their Personal Devices by a Forensic Examiner in Order to Ascertain the Scope of Dissemination of its Confidential Information and to Remove the Former Officers' Access to the Same

57.     On January 31, SLM's Director People, Blaine Klaczak, sent Currie and Ratliff the following preservation notice and demand for the return of their SLM laptops and other devices:

> You will be receiving, if you have not already, a shipping label from Carl for the return of your Company laptop/devices. Do not delete or alter any information on your Company laptop/devices in any way prior to returning it and please include on a separate piece of paper the passcode to access your Company laptop/devices if it is passcode-protected.

> This letter also serves as formal notice of your obligation to preserve and not destroy, discard, alter, or delete any evidence (whether in the form of documents, emails, text messages, blogs, telephone records, or anything else, and regardless of the medium in which such evidence may be stored) relating in any way to your employment with the Company, your prospective employment with any other person or entity, and/or your communications with any actual or prospective business relationships of the Company, including, without limitation, [] University. This obligation includes taking affirmative steps to preserve copies of your text messages, which may be lost if such affirmative steps are not taken.

58.     As of February 6, neither Currie nor Ratliff had returned any of their SLM devices to SLM.

59.     On February 6, SLM's counsel, William J. Wortel ("Wortel"), sent a letter to Currie's spouse and attorney, Counsel Currie, outlining some of the misconduct described above that SLM had uncovered as a result of its internal investigation:

As Paula and Megan know, SLM has expended a considerable amount of time, money, and effort to protect and maintain the secrecy of all information relating to its business operations, has invested significant dollars and effort into its proprietary information, its customers/potential customers (including, without limitation, the identity of key customer/potential customer contacts), customer/potential customer needs and requirements, cost and pricing information, and even to some extent the particular strengths, skills, and capabilities of certain of its employees. During the time Megan and Paula were employed and compensated by SLM, they were provided access to SLM's customers and potential customers and related confidential information and trade secrets in reliance upon their binding contractual promise not to use, exploit, or misappropriate such trade secrets or confidential information to SLM's competitive disadvantage. SLM takes these contractual provisions very seriously and expects Megan and Paula to respect and abide by them.

Despite these clear and unequivocal promises, both Paula and Megan have breached their contractual obligations to SLM by recently forwarding to their personal email addresses a massive amount of SLM's most sensitive, competitively valuable, confidential and trade secret information, including, without limitation, detailed account information from Salesforce and other Company databases for every single SLM account; detailed historical and current pricing information; sales forecasting information and data showing progress against the same; "win/loss" reports for all SLM customers and prospective customers, broken down by territory, state, and account executive; dozens of screenshots of white boards from SLM's most recent three-day Annual Meeting reflecting the collective leadership's most sensitive ideas concerning SLM's strengths, weaknesses, strategic threats, and strategic planning; SLM's proprietary employee training materials, job descriptions, and employee compensation data; the identities of customers and prospective customers attending in-person sales pitches; the identities and contact information of key decision-makers of customers and potential customers; and information concerning customers' and potential customers' needs and preferences.

There is no legitimate reason for Paula or Megan to have forwarded SLM's most sensitive and competitively valuable information to their personal email accounts during the same time period in which they gave notice of their resignations, other than to use or disclose such information for the purpose of providing an SLM competitor an unfair competitive advantage over SLM.

It also is clear that Megan intends to solicit a SLM prospective customer, [][the "University"], following her separation from her employment with SLM. For example, on January 25 (one day before she tendered her two-weeks' notice), Megan asked a key [University] decision-maker to call her cell phone in two weeks to move forward with a sales opportunity that Megan developed over an extended period of time while serving as SLM's Regional Vice President:

In addition to asking the key contact to call her personal cell phone, Megan copied both her and Paula's personal email addresses, leaving no doubt that they intend to

pursue the University on behalf of a SLM competitor in clear violation of Megan's Employment Agreement and Paula's NDA (the latter of which prohibits the use of SLM's confidential information relating to SLM's proposals to the University).

Similarly, on the Monday of the week Paula tendered her two-weeks' notice, Paula emailed to her personal email address the contact information for five key decision-makers for another SLM potential customer, [large united school district].

SLM also has learned that, during a conversation in December 2023, Megan solicited SLM's Director of Procurement to leave her employment with the Company to work for Diamond Assets, in clear violation of Megan's employment non-solicitation restriction. (Employment Agreement, §2.6)

SLM is also particularly troubled by Megan's recent purchase of a two (2)-Terabyte portable hard drive from Staples, about which SLM received an email notice on February 2, just a day after the Company requested the return of Megan's SLM computer and iPad.

Thus, Megan and Paula already have materially breached their contracts with the Company. Notably, SLM is entitled to recover the attorneys' fees and costs it expends in any action it may file to enforce its rights under the Employment Agreement. (Employment Agreement, §3.5.)

. . . .

Separate and apart from their contractual obligations to SLM, as officers of SLM, Paula and Megan owed (and owe) the Company the utmost duties of good faith and loyalty through the last day of their employment on February 9. *See Hoover Transp. Services, Inc. v. Frye*, 2002 WL 31409888, at *9 (S.D. Ohio July 17, 2002) ("An agent is a fiduciary with respect to matters within the scope of his agency, and is bound to exercise utmost good faith and loyalty towards his principal or employer."). The above-described egregious misconduct clearly constitute breaches of their fiduciary duties of good faith and loyalty to SLM, for which SLM may recover punitive damages in additional to actual damages.

In addition, Paula and Megan were (and are) prohibited from misappropriating SLM's trade secret information by the U.S. Defend Trade Secrets Act, 18 U.S.C. §1836, et seq. ("DTSA"), and Ohio's Uniform Trade Secrets Act, RC 1333.61, et seq. The information that Megan and Paula have forwarded to their personal email addresses clearly rises to the level of a "trade secret" under these statutes. Moreover, Megan's Employment Agreement and Paula's NDA both contain the DTSA's "safe harbor" language, which permits SLM to recover punitive damages and the attorneys' fees and costs it incurs in establishing violations of that statute. 18 U.S.C. §1833(b)(3). . . .

(Wortel Feb. 6 Letter to Counsel Currie.)

60. In his February 6 letter, Wortel also included the following demands in an effort to mitigate future harm to SLM:

> SLM is very concerned that Megan and Paula forwarded SLM's confidential and proprietary trade secret information to their personal email addresses (the "Stolen Information") for the intended purpose of using and/or disclosing such information in their new roles working for a SLM competitor. Clearly, a competitor's use and/or disclosure of the Stolen Information would give such company an unfair competitive advantage in the marketplace to the severe detriment of SLM's competitive position.

> Given the scope of the suspected misconduct by Paula and Megan, their personal email accounts, cloud-based accounts, social media accounts, personal computers/tablets, and other storage devices may contain important evidence relating to this dispute. Accordingly, SLM asks and demands that Paula and Megan:

> - To the extent they have not already done so, and consistent with the emails previously sent by Blaine Klaczak to Paula and Megan, immediately return to the Company their SLM laptops and iPads without deleting, modifying, or altering any information on them, and include in the return package the password(s) for such device(s);

> - Preserve in its current state, without modification, alteration, or deletion, all of the Stolen Information and all other confidential information and/or trade secret information (as those terms are defined or described in the Employment Agreement and the NDA) (with the Stolen Information, the "Confidential Information") and all other information Paula and/or Megan have relating to their work for SLM, including evidence of such information's transfer, disclosure, copying, storage, printing, or prior deletion of such information, whether in electronic or tangible medium, on their work and personal computer(s), work and personal storage devices, work and personal smart phone(s) (including text messages and iMessages), social media and business networking accounts, and/or work and personal email accounts (including, without limitation, the personal email accounts to which they forwarded the Stolen Information);

> - Immediately return to Blaine Klaczak's attention via FedEx or UPS all hard copies containing any Confidential Information or other information relating to their work for SLM;

> - Preserve in its current state, without modification, alteration, or deletion, all information pertaining to any communications Megan and/or Paula had at any time from November 1, 2023, through the present, with any customer, potential customer, or other business relationship in connection with their employment with SLM, including evidence of such information's transfer, disclosure, copying, storage, printing, or prior deletion of such information, whether in electronic or tangible medium, on their work and personal computer(s), work and personal storage devices, work and personal smart phone(s) (including text messages and iMessages), social

media and business networking accounts, and/or work and personal email accounts (including, without limitation, the personal email accounts to which they forwarded the Stolen Information);

- Identify every customer, potential customer, and other business relationship with whom Paula and/or Megan had contact during the previous 12 months, to whom Paula and/or Megan had any communications regarding their resignation/separation from their employment with SLM and/or the identity of the entity for whom either or both intend to begin working, the date of such communication, and the substance of such communication.

- Preserve in its current state, without modification, alteration, or deletion, all information pertaining to any communications Megan and/or Paula had with any third party and/or each other for the time period of July 1, 2023, through the present, about the prospect of performing any services for remuneration for any entity other than SLM, including evidence of such information's transfer, disclosure, copying, storage, printing, or prior deletion of such information, whether in electronic or tangible medium, on their work and personal computer(s), work and personal storage devices, work and personal smart phone(s) (including text messages and iMessages), social media and business networking accounts, and/or work and personal email accounts (including, without limitation, the personal email accounts to which they forwarded the Stolen Information);

- For the time period of November 1, 2023, through the present, identity any entity for whom Paula and/or Megan have accepted any offer to perform services in exchange for remuneration (excluding SLM) so that SLM may immediately notify such entity of their concerns outlined in this letter and take appropriate action to mitigate the risk of additional breaches and violations.

Given the volume, breadth, and sensitivity of the Stolen Information, SLM believes Paula's and Megan's personal computer(s), personal storage devices, personal smart phone(s), and personal email accounts need to be forensically examined by a third-party vendor in order to determine whether SLM's confidential, trade secret, and/or proprietary information is/has been present thereon, copied, printed, and/or transmitted. We believe that it is in all parties' best interests to promptly cooperate in good faith to determine the scope of any use or disclosure of any Confidential Information. SLM is continuing to investigate this matter and will take all actions necessary to protect its confidential, proprietary, and trade secret information.

. . . .

(*Id.*)

61.     On February 7, Wortel and Counsel Currie held two telephone calls, the first of which was also attended by another attorney for SLM, John Goebel ("<u>Goebel</u>"). During the first

call, Counsel Currie claimed that he had not yet had an opportunity to speak with his clients, Currie

(his spouse) or Ratliff. However, Counsel Currie stated that Currie had not made any decisions

about her future employment and was even considering going back to work for her former

employer, Apple. Counsel Currie further advised that, to his knowledge, Ratliff had not had any

communications with any prospective employers.

62.     During the second February 7 telephone call, Counsel Currie advised Wortel that,

a couple of weeks prior, Currie had been working on her SLM-issued laptop while taking a bath

and had "accidentally" dropped her SLM laptop into the water.

63.     Later that day (February 7), Wortel sent an email to Counsel Currie stating as

follows:

> Mike – Per our calls today:
>
> 1.  You confirmed that Paula and Megan will remain employed through this
>     Friday, February 9.
>
> 2.  Please provide a complete list of the Company devices (computers, iPads,
>     iPhones) Paula and Megan have, including model numbers and serial numbers.
>
> 3.  Please provide the tracking information for the return of those Company devices
>     as soon as possible. There is no reason why these devices should not already be
>     in transit to the Company.
>
> 4.  Please forward a detailed list of Paula's expenses for January. As I mentioned,
>     there were some flights purchased and then cancelled, with the credit going to
>     Paula's personal airline account. The Company needs to reconcile these
>     expenses for purposes of Paula's last paycheck.
>
> We look forward to our call tomorrow to discuss the matters in my letter that you
> were not prepared to discuss today.
>
> Regards,
>
> Bill

(Wortel Feb. 7 Email to Counsel Currie.)

64.     On February 8, Counsel Currie sent an email to Wortel and Goebel, copying his Illinois local counsel, John Moynihan ("Moynihan") and Jeff Corso ("Corso"), to schedule a call later that day.

65.     Wortel responded to Counsel Currie's email as follows:

Mike – Okay, we'll circulate an invitation for a call at 4:15 (CT)/5:15 (ET). To confirm, we are expecting you to participate in the call as well.

Please also advise ASAP by reply email whether all Company devices have been sent back to the Company and the tracking information for those packages, as we discussed yesterday. Paula and Megan have had the prepaid return boxes since last weekend, and there is no legitimate reason for their delay in sending them back.

As a reminder, Paula also needs to provide ASAP her list of expenses for January for purposes the Company calculating her final paycheck amount.

Thanks. Bill

66.     Counsel Currie responded as follows to Wortel's February 8 email:

John and Jeff will address the computer issue. Based upon my discussion with counsel today I expect the SLM devices can be sent yet today or first thing tomorrow.

As for the expenses she does not have access to the AMex statements in order to do that. Please have SLM provide the statements for the period in question.

(Counsel Currie's Feb. 8 Email to Wortel.)

67.     Approximately one hour later, Wortel responded to Counsel Currie's email with copies of Currie's and Ratliff's January AMEX credit card statements. Counsel Currie responded that he had forwarded the AMEX credit card statements to Currie and Ratliff.

68.      Later that day (February 8), a telephone call was convened with Counsel Currie, Moynihan, Corso, Wortel, and Goebel. During that call, Counsel Moynihan advised that neither he nor Corso had read Wortel's February 6 letter or spoken directly with either Currie or Ratliff. Wortel explained the importance of Currie and Ratliff making their personal devices and email accounts available for forensic examination by a third-party forensic examiner pursuant to a

mutually agreeable forensic examination agreement, as set forth in Wortel's February 6 letter to Counsel Currie. Wortel explained that the forensic examination agreement would include protocols to (a) prevent the inadvertent disclosure of any of Currie's or Ratliff's personal information to SLM, (b) ascertain the scope of dissemination of SLM's confidential and trade secret information, (c) remove from such personal devices and accounts all access to SLM's confidential and trade secret information, and (d) allow for the return of such personal devices to Currie and Ratliff following such removal. While the parties disagreed about who should be responsible for the fees associated of the third-party vendor, the parties agreed that SLM would prepare the first draft forensic examination agreement.

69.     During the February 8 call, the parties also agreed that SLM would prepare first drafts of sworn declarations for Currie's and Ratliff's execution regarding any use and/or disclosure of SLM's confidential and trade secret information.

70.     The next day, on Friday, February 9, Wortel sent Counsel Currie, Moynihan, and Corso a draft of a forensic examination agreement, along with the following cover email:

> Counsel: We have attached a draft of the forensic examination agreement. We would like to try to finalize by COB Monday, if possible, so we can start the collection process. Please let us know your availability Monday afternoon for a call to discuss.
>
> Please confirm that the SLM devices have been sent back in the boxes provided. Please also provide tracking information, unless the boxes provided by SLM were prepaid with SLM's account information.
>
> We're working on the declarations we discussed yesterday.
>
> *This email also will confirm that neither Paula nor Megan has definitive plans to work for anyone else at the present time.*
>
> Thanks. Bill

(Wortel Feb. 9 Email to Counsel Currie, *et al*.) (emphasis added).

71.     In lieu of providing any suggested revisions to the draft forensic examination agreement forwarded by Wortel, on Monday, February 12, Currie and Ratliff filed an utterly baseless whistleblower/constructive discharge complaint in the U.S.D.C. for the Southern District of Ohio (the "Ohio Lawsuit"). In that complaint, Currie and Ratliff claimed for the first time that they had resigned their employment with SLM "in order to avoid committing any felonies."

72.     At no time during their tenures with SLM had Currie or Ratliff complained that they believed SLM had engaged in any criminal behavior, much less that they were resigning their employment with SLM due to a concern that they would commit unidentified "felonies" if their employment continued.

73.     The Ohio Lawsuit is a transparent and desperate attempt to divert the courts' and public's attention from the Former Officers' egregious theft of SLM's confidential and trade secret information and serious breaches of their fiduciary duties while serving as Officers of SLM.

74.     Ratliff also amended the Ohio Lawsuit to challenge the enforceability of the Ratliff Employment Agreement. Ratliff's filing of the Ohio Lawsuit and amendments constitute a clear breach of Section 3.6 of the Ratliff Employment Agreement, in which she expressly agreed that "[a]ny litigation that may be brought by either party involving the enforcement of this Agreement or the rights, duties, or obligations of this Agreement, shall be brought exclusively in the state or federal courts sitting in Chicago, Illinois." (Ratliff Employment Agreement, §3.6.)

75.     On February 13, Counsel Currie sent a letter to Wortel attaching a copy of the Ohio Lawsuit complaint and, among other things, refused to make Currie's or Ratliff's personal devices available for any examination under a mutually agreeable forensic examination agreement otherwise, reasoning in part that Currie and Ratliff should not be responsible for the expense of any forensic examination of such personal devices.

76.     Shortly thereafter, SLM learned from one of its employees that Diamond Assets

had hired Currie in an executive sales role.

77.     On February 20, Wortel sent a letter to Diamond Asset's Chief Executive Officer,

Diamond McKenna, stating, in relevant part:

Dear Ms. McKenna:

. . . . As you know, Diamond Assets LLC ("DA") recently hired Paula Currie,
SLM's former Vice President of Procurement. On April 24, 2019, as a condition of
her employment with SLM, Ms. Currie signed a Non-Disclosure Agreement (the
"NDA"), in which she promised not to use or disclose, directly or indirectly, any of
SLM's confidential or trade secret information for any purpose other than for the
performance of her duties for SLM, and to return the same (along with any other
property of SLM) to SLM upon request. . . .

Despite these promises, prior to resigning her employment with SLM, Ms. Currie
emailed from her SLM email account to her personal email account a substantial
number of files containing SLM's confidential and trade secret information. The
files taken by Ms. Currie include highly confidential, proprietary, and
competitively valuable information aggregated and developed by SLM through
significant financial investment and time over the course of many years, including,
without limitation: detailed account information from Salesforce and other SLM
databases for every single SLM account; detailed historical and current pricing
information; sales forecasting information and data showing progress against the
same; "win/loss" reports for all SLM customers and prospective customers, broken
down by territory, state, and account executive; dozens of screenshots of white
boards from SLM's most recent three-day Annual Meeting reflecting the collective
leadership's most sensitive ideas concerning SLM's strengths, weaknesses,
strategic threats, and strategic planning; SLM's proprietary employee training
materials, job descriptions, and employee compensation data; the identities of
customers and prospective customers attending in-person sales pitches; the
identities and contact information of key decision-makers of customers and
potential customers; and information concerning customers' and potential
customers' needs and preferences (collectively, the "Procured Information").

SLM is very concerned that Ms. Currie misappropriated the Procured Information
for the intended purpose of using and/or disclosing such information in her new
executive sales role with DA, to the extent she has not done so already. Clearly,
DA's use and/or disclosure of the Procured Information would give DA an unfair
competitive advantage in the marketplace to the severe detriment of SLM's
competitive position.

Given the scope of the suspected misconduct by Ms. Currie, DA's computers and
back-up servers may contain important evidence relating to Ms. Currie's conduct.

We ask and demand that DA immediately: . . . Place Ms. Currie on a leave of absence and suspend her access to all DA information systems and databases until we have an opportunity to explore a resolution that protects SLM's contractual and property rights and limits DA's potential liability.

We believe that it is in all parties' best interests to promptly cooperate in good faith to determine the scope of any use and disclosure of the Procured Information. SLM is continuing to investigate this matter and will take all actions necessary to protect its confidential, proprietary, and trade secret information.

Please let me know your availability (or, if you have retained legal counsel, have your counsel contact me regarding his/her availability) for a call to discuss these matters by no later than the close of business Thursday, February 22, 2024. We appreciate, in advance, DA's cooperation in this regard.

Relatedly, SLM suspects that DA is considering hiring SLM's former Vice President of Sales, Megan Ratliff, who resigned on the same date as Ms. Currie. Please be advised that Ms. Ratliff's employment with DA any time prior to February 9, 2025, would constitute a clear breach of Ms. Ratliff's restrictive covenant agreement with SLM and subject DA to liability for tortious interference with SLM's contract with Ms. Ratliff. We can discuss this concern as well during our upcoming call.

. . . .

(Wortel Feb. 20 Letter to D. McKenna.)

78.     On February 20, following additional internal investigation and in the interest of compromise, Wortel sent a letter to Counsel Currie stating, in part: "In the interest of compromise, without prejudice to any position SLM may decide to take in the future, SLM will initially pay [the forensic examiner's] fees without a commitment that any such fees will be reimbursed by Paula or Megan. SLM also is open to discussing any proposed revisions to the F[orensic] E[xamination] A[greement], but those devices do need to be examined so that SLM can ensure (to the extent possible) that everything possible is being done to prevent the further dissemination of SLM's confidential and trade secret information." (Wortel Feb. 20 Letter to Currie, *et al.*)

79.     In his February 20 letter, Wortel also expressed his disappointment in Counsel Currie's prior misrepresentation that his spouse, Currie, had not had definitive plans to work for any competitor:

> As you saw from the letter I sent to [Diamond Assets], SLM has learned that [Diamond Assets] has hired Paula. [Diamond Assets'] hiring of Paula is contrary to the recent assurances you provided that Paula did not have any offers or firm plans to join a competitor and was even considering returning to Apple. In any event, you are welcome to join the call that I am attempting to schedule with [Diamond Assets] to discuss [Diamond Assets'] obligation to investigate these matters to ensure (to the extent possible) that none of SLM's confidential and trade secret information has been transferred to any of [Diamond Assets'] systems or has been communicated to DA personnel.

(Id.)

80.     On February 26, Counsel Currie responded to the above-quoted portion of Wortel's February 20 letter as follows:

> As an initial point, I did not at any time assure you that Paula did not have any offers or firm plans to join a competitor. I told you specifically when you inquired that she was considering her options having had several calls from companies seeking to hire her and that a position returning to Apple was also a consideration. Right after that call she advised me she had made the decision to accept a position at Diamond. After that decision was made we never had any discussion about what she intended to do and, frankly, there was no obligation of any kind to inform you or SLM where she chose to go to work as she does not have a non-compete or employment contract with SLM.

(Counsel Currie Feb. 20 Letter to Wortel.)

81.     These statements were false. As noted above, Currie executed her offer letter and employment agreement with Diamond Assets on January 22, with a February 5 anticipated start date. Moreover, Counsel Currie participated in following January 27 group chat about Currie's intention to "go blow up [Diamond Assets]" with Ratliff:

> Currie: "And so is my partner in crime! We made it happen *and now we go blow up DA [Diamond Assets]!*" (Emphasis added.)
>
> . . . .

<u>Counsel Currie</u>: Let the good times roll!

82.     To date, Currie and Ratliff have refused to make their personal devices available for forensic examination pursuant to a forensic examination agreement or otherwise. Without the opportunity to examine those devices, as well as the Former Officers' personal email accounts and cloud-based accounts, there is no way for SLM to ascertain the full scope of how the Stolen Information has been used by the Former Officers, where the Stolen Information is currently stored, to which cloud-based accounts the Stolen Information has been transferred, or the persons or entities with whom any of the Stolen Information has been shared. The Former Officers' recalcitrance is particularly problematic given their heavy use of their personal devices for SLM business, including an iPad Pro carried and used by Currie during the relevant time period, and Ratliff's admitted use of her own personal computer as her primary device for conducting SLM business.

83.     Moreover, when Currie's SLM-issued laptop was returned to SLM, which Currie claimed to have accidentally dropped into her bath tub, there was extensive water damage in the chassis that indicated submergence in water for an extended period of time:



84.     SLM has been unable to access data on the hard drive due to the risk of data being lost as a result of the damaged condition of the laptop.

85.     Upon information and belief, including Currie's theft of the Stolen Information, refusal to make her personal devices available for examination, and other gross misconduct, Currie

deliberately damaged her SLM-issued laptop in an attempt to prevent SLM from discovering the full scope of her misconduct.

86. Despite SLM's multiple demands, Currie and Ratliff also have failed to submit their expense reports, as required by the Corporate Credit Card Use Agreements, thereby affirming their false claims that all purchases on their corporate credit cards were legitimate SLM expenses.

87. To date, Currie continues to serve as Diamond Assets' Senior Vice President of Procurement, Education.

88. In light of Currie's theft of the Stolen Information, and the other confidential and trade secret information made available to Currie during her tenure with SLM, if she is allowed to continue to be employed with Diamond Assets in her current capacity, it is inevitable, given the direct nature of competition between Diamond Assets and SLM, that Currie, with or without motive or intent, will use and/or disclose confidential, proprietary, and trade secret information belonging to SLM for the benefit of Diamond Assets and to the serious financial detriment of SLM.

89. Currie cannot possibly lead Diamond Assets' Procurement Team in the Education market without using or disclosing SLM's confidential and trade secret information. In her role as the highest-ranking Officer of Diamond Assets in Procurement for educational institutions, Currie will have substantial input in crafting Diamond Assets' overall procurement strategy, including the targeting of prospective customers and specific geographic territories and vertical markets based on the strategic analysis conducted by SLM over the past several years at great expense. It would be virtually impossible for Currie to successfully perform this key executive role without using or disclosing a substantial portion of the Stolen Information, such as SLM's detailed "win/loss" records for past opportunities broken down by, among other things, territory, vertical

market, and competitors, or SLM's planned 2024 adjustments relating to sales territories, sales headcounts, pricing, and marketing budgets.

90.     Currie's use of SLM's trade secret information to give Diamond Assets an unfair competitive advantage over SLM is even more unavoidable given Currie's recent selection of SLM's most confidential and competitively valuable trade secret information which, as noted above, she *already has used* to assist Diamond Assets, and which she no doubt has recently reviewed in detail in connection with her new position as Diamond Assets' Senior Vice President of Procurement, Education. Indeed, if she did not plan to use SLM's trade secret information, she would not have stolen it right after accepting her employment with Diamond Assets.

### COUNT I
### BREACH OF FIDUCIARY DUTIES (CURRIE)

91.     SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

92.     As an Officer of SLM, Currie owed SLM fiduciary duties, including duties of loyalty, candor, fair dealing, and good faith, as well as the duty not to usurp corporate opportunities and the duty not to misappropriate corporate assets.

93.     Currie breached her fiduciary duties to SLM by acting in her own interests and not in the interests of SLM while serving as an Officer of SLM by, *inter alia*:

a) Transferring the Stolen Information to her personal email account and devices;

b) Sharing SLM's confidential and trade secret information relating to the School District Opportunities with SLM's direct competitor, Diamond Assets;

c) Usurping, or attempting to usurp, the unified school district opportunity identified herein by sending to her personal email address the contact information for the key decisionmakers for that opportunity;

d) Using her corporate credit card for personal expenses;

e) Sending to Counsel Currie SLM's attorney-client privileged information regarding a prior non-competition dispute with Diamond Assets; and

f) Deliberately damaging her SLM-issued laptop for the purposes of preventing SLM from discovering the full scope of her misconduct.

94.     Currie's breaches of fiduciary duties have directly and proximately resulted in damages to SLM.

95.     Currie's conduct was intentional, reckless, in bad faith, and in total disregard of the fiduciary duties she owed to SLM, entitling SLM to a multi-million dollar punitive damages award.

96.     SLM is entitled to the disgorgement of all compensation paid to Currie during the time periods in which she was breaching her fiduciary duties to SLM.

## COUNT II
## BREACH OF FIDUCIARY DUTIES (RATLIFF)

97.     SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

98.     As an Officer of SLM, Ratliff owed SLM fiduciary duties, including duties of loyalty, candor, fair dealing, and good faith, as well as the duty not to usurp corporate opportunities and the duty not to misappropriate corporate assets.

99.     Ratliff breached her fiduciary duties to SLM by acting in her own interests and not in the interests of SLM while serving as an Officer of SLM by, *inter alia*:

a)  Entering false information into Salesforce in respect of the large university opportunity described herein for the purpose of (i) reducing the likelihood of SLM closing that opportunity, and/or (ii) assisting Diamond Assets in pursuing that opportunity;

b)  Misappropriating SLM's corporate assets by using her corporate credit card for personal expenses;

c)  Downloading a report of all open SLM opportunities for SLM's entire West Sales Territory, including every account name, the quantities and types of Apple devices, the value of the opportunity, and other detailed information, for the purpose of providing Diamond Assets with an unfair competitive advantage over SLM; and

d)  Upon information and belief, using or disclosing to Diamond Assets other competitively valuable information for the purpose of giving Diamond Assets an unfair competitive advantage over SLM.

100.    Ratliff's breaches of fiduciary duties have directly and proximately resulted in damages to SLM.

101.    Ratliff's conduct was intentional, reckless, in bad faith, and in total disregard of the fiduciary duties she owed to SLM, entitling SLM to a multi-million dollar punitive damages award.

102.    SLM is entitled to the disgorgement of all compensation paid to Ratliff during the time periods in which she was breaching her fiduciary duties to SLM.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER 18 U.S.C. §1836 (CURRIE)

103.    SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

104.    SLM is the owner of the above-described valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce, including, without limitation, the Stolen Information and other highly confidential and competitively valuable information relating to the procurement and sale of Apple devices throughout the United States.

105.    SLM's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

106.    SLM has taken the above-described reasonable measures to keep such information secret.

107.    SLM did not give Currie express or implied permission to transfer, discuss, divulge, or use for competitive purposes any of SLM's trade secrets.

108.    Currie misappropriated SLM's trade secrets for the purpose of targeting SLM's existing and prospective customers and to compete unfairly in the marketplace, capitalizing on SLM's investment of time, resources, and goodwill.

109.    Currie's misappropriation of SLM's trade secrets was knowing, willful, and malicious.

110.    Currie was aware, or had reason to be aware, at the time of her disclosure and/or use of SLM's trade secrets that she was contractually restricted from using or disclosing SLM's trade secret information.

111. Accordingly, Currie knew, or had reason to know, at the time of the disclosure and use of the trade secrets, that she acquired her knowledge of SLM's trade secrets under circumstances giving rise to her duty to maintain the secrecy of the trade secrets, including, without limitation, through her knowledge of the restrictions in the Currie Employment Agreement.

112. As a result of Currie's misappropriation of SLM's trade secrets, SLM has suffered harm in the form of, *inter alia*, actual misappropriation of SLM's trade secrets, and injury and harm to its goodwill and business reputation.

113. SLM is entitled to preliminary and permanent injunctive relief and an award of all actual direct and consequential damages sustained as a result of Currie's misappropriation, exemplary damages under 18 U.S.C. §1836(b)(3)(B), and an award of SLM's reasonable attorneys' fees in bringing this cause of action.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER 18 U.S.C. §1836 (RATLIFF)

114. SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

115. SLM is the owner of the above-described valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce, including, without limitation, the above-described report of all open SLM opportunities for SLM's entire West Sales Territory, including every account name, the quantities and types of Apple devices, the value of the opportunity, and other detailed information, as well as other highly confidential and competitively valuable information relating to the procurement and sale of Apple devices.

116. SLM's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

117. SLM has taken the above-described reasonable measures to keep such information secret.

118. SLM did not give Ratliff express or implied permission to discuss, divulge, or use for competitive purposes any of SLM's trade secrets.

119. Ratliff misappropriated SLM's trade secrets for the purpose of targeting SLM's existing and prospective customers and to compete unfairly in the marketplace, capitalizing on SLM's investment of time, resources, and goodwill.

120. Ratliff's misappropriation of SLM's trade secrets was knowing, willful, and malicious.

121. Ratliff was aware, or had reason to be aware, at the time of her disclosure and/or use of SLM's trade secrets that she was contractually restricted from using or disclosing SLM's trade secret information.

122. Accordingly, Ratliff knew, or had reason to know, at the time of the disclosure and use of the trade secrets, that she acquired her knowledge of SLM's trade secrets under circumstances giving rise to her duty to maintain the secrecy of the trade secrets, including, without limitation, through her knowledge of the restrictions in the Ratliff Employment Agreement.

123. As a result of Ratliff's misappropriation of SLM's trade secrets, SLM has suffered harm in the form of, *inter alia*, actual misappropriation of SLM's trade secrets, and injury and harm to its goodwill and business reputation.

124.    SLM is entitled to an award of all actual direct and consequential damages sustained as a result of Ratliff's misappropriation, exemplary damages under 18 U.S.C. §1836(b)(3)(B), and an award of SLM's reasonable attorneys' fees in bringing this cause of action.

**COUNT V**
**MISAPPROPRIATION OF TRADE SECRETS UNDER**
**THE ILLINOIS TRADE SECRETS ACT 765 ILCS 1065/1, *et seq.* (CURRIE)**

125.    SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

126.    SLM owns information that constitutes trade secrets pursuant to the provisions of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA")

127.    SLM's valuable trade secrets were disclosed to Currie in the course of her employment with SLM.

128.    Currie's above-described conduct violates the ITSA.

129.    Currie knew or had reason to know that such trade secrets are confidential and proprietary to SLM. However, despite such knowledge, upon information and belief, Currie improperly used for herself and/or disclosed to third parties such trade secrets without SLM's express or implied consent.

130.    As a result of Currie's misappropriation of trade secrets, SLM has been damaged in an amount to be determined at trial.

131.    Currie's misappropriation of SLM's trade secrets was both willful and malicious, and undertaken to inflict damage on SLM's business operations.

132.    SLM is entitled to an award of all actual direct and consequential damages sustained as a result of Currie's misappropriation, punitive damages for Currie's willful and malicious misappropriation, and an award of SLM's reasonable attorneys' fees in bringing this action.

### COUNT VI
### MISAPPROPRIATION OF TRADE SECRETS UNDER
### THE OHIO UNIFORM TRADE SECRETS ACT, RC 1333.61, *et seq.* (CURRIE)

133.    SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

134.    Currie's conduct in misappropriating trade secrets violates Illinois law. If, however, Ohio rather than Illinois law were to apply to SLM's trade secret misappropriation claims, then Currie's conduct violates the Ohio Uniform Trade Secrets Act, RC 1333.61, *et seq.* ("OUTSA").

135.    SLM is and was the owner of the above-described trade secret information, tangible and intangible and electronically kept or stored, that constitutes, represents, evidences, and/or records a secret scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers.

136.    SLM's information described herein constitutes valuable trade secrets related to products and services.

137.    SLM's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

138.    SLM took the above-described reasonable steps to preserve the secrecy and confidentiality of the information.

139.    Currie knew or had reason to know that such trade secrets are confidential and proprietary to SLM. However, despite such knowledge, upon information and belief, Currie improperly used for herself and/or disclosed to third parties such trade secrets without SLM's express or implied consent.

140.     Currie used improper means, including breaching the Currie Employment Agreement, to acquire and use SLM's trade secrets to Currie's advantage and to SLM's detriment.

141.     As a result of Currie's misappropriation of SLM's trade secrets, SLM has suffered harm in the form of, *inter alia*, actual misappropriation of SLM's trade secrets, and injury and harm to its goodwill and business reputation.

142.     Currie's misappropriation of SLM's trade secrets was knowing, willful and malicious, and undertaken to inflict damage on SLM's business operations.

143.     SLM is entitled to an award of all actual direct and consequential damages sustained as a result of Currie's misappropriation, and exemplary damages pursuant to RC 1333.63.

**COUNT VII**
**MISAPPROPRIATION OF TRADE SECRETS UNDER**
**THE ILLINOIS TRADE SECRETS ACT 765 ILCS 1065/1, *et seq.* (RATLIFF)**

144.     SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

145.     SLM owns information that constitutes trade secrets pursuant to the provisions of the ITSA.

146.     SLM's valuable trade secrets were disclosed to Ratliff in the course of her employment with SLM.

147.     Ratliff's above-described conduct violates the ITSA.

148.     Ratliff knew or had reason to know that such trade secrets are confidential and proprietary to SLM. However, despite such knowledge, upon information and belief, Ratliff improperly used for herself and/or disclosed to third parties such trade secrets without SLM's express or implied consent.

149.     As a result of Ratliff's misappropriation of trade secrets, SLM has been damaged in an amount to be determined at trial.

150.     Ratliff's misappropriation of SLM's trade secrets was both willful and malicious, and undertaken to inflict damage on SLM's business operations.

151.     SLM is entitled to an award of all actual direct and consequential damages sustained as a result of Ratliff's misappropriation, punitive damages for Ratliff's willful and malicious misappropriation, and an award of SLM's reasonable attorneys' fees in bringing this action.

**COUNT VIII**
**MISAPPROPRIATION OF TRADE SECRETS UNDER**
**THE OHIO UNIFORM TRADE SECRETS ACT, RC 1333.61, *et seq.* (RATLIFF)**

152.     SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

153.     SLM alleges that Ratliff's conduct in misappropriating trade secrets violates Illinois law. If, however, Ohio rather than Illinois law were to apply to SLM's trade secret misappropriation claims, then Ratliff's conduct violates the OUTSA.

154.     SLM is and was the owner of the above-described trade secret information, tangible and intangible and electronically kept or stored, that constitutes, represents, evidences, and/or records a secret scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers.

155.     SLM's information described herein constitutes valuable trade secrets related to products and services.

156.     SLM's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

157.     SLM took the above-described reasonable steps to preserve the secrecy and confidentiality of the information.

158.    Ratliff knew or had reason to know that such trade secrets are confidential and proprietary to SLM. However, despite such knowledge, upon information and belief, Ratliff improperly used for herself and/or disclosed to third parties such trade secrets without SLM's express or implied consent.

159.    Upon information and belief, Ratliff used improper means, including breaching her Employment Agreement, to acquire and use SLM's trade secrets to Ratliff's advantage and to SLM's detriment.

160.    As a result of Ratliff's misappropriation of SLM's trade secrets, SLM has suffered harm in the form of, *inter alia*, actual misappropriation of SLM's trade secrets, and injury and harm to its goodwill and business reputation.

161.    Ratliff's misappropriation of SLM's trade secrets was knowing, willful and malicious, and undertaken to inflict damage on SLM's business operations.

162.    SLM is entitled to an award of all actual direct and consequential damages sustained as a result of Ratliff's misappropriation, and exemplary damages pursuant to RC 1333.63.

## COUNT IX
## CIVIL CONSPIRACY (BOTH DEFENDANTS)

163.    SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

164.    Currie and Ratliff entered into an agreement to violate federal and state trade secret law, breach their fiduciary duties to SLM, and breach their respective Employment Agreements.

165.    By Currie's own admission, Ratliff was her "partner in crime."

166.    In furtherance of their agreement: (a) Currie and Ratliff downloaded or otherwise transferred SLM's confidential and trade secret information to their personal email accounts and/or devices; (b) Ratliff solicited SLM's current employee; (c) Currie assisted Diamond Assets in

competing directly with SLM while still employed by SLM; and (d) Ratliff falsified information in SLM's systems to harm SLM's business opportunities.

167.    Currie and Ratliff's participation in, and acts in furtherance of, this civil conspiracy have directly and proximately resulted in damages to SLM.

168.    Currie's and Ratliff's conduct was intentional, reckless, and in bad faith, entitling SLM to punitive damages.

169.    SLM is entitled to the disgorgement of all compensation paid to Currie and Ratliff during the time periods in which they were engaged in this civil conspiracy.

## COUNT X
## BREACH OF CONTRACT (CURRIE EMPLOYMENT AGREEMENT)

170.    SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

171.    The Currie Employment Agreement is a valid, binding contract, supported by adequate consideration, and is in full force and effect.

172.    SLM performed all of its duties and obligations under the Currie Employment Agreement.

173.    Notwithstanding SLM's performance of its duties and obligations, Currie breached the Currie Employment Agreement by transferring, using, and/or disclosing SLM's confidential and trade secret information other than in the performance of her job duties for SLM.

174.    Currie also breached the Currie Employment Agreement by failing to return SLM's confidential and trade secret information to SLM upon demand, including by refusing to make available her personal devices and accounts used by Currie for SLM business for purposes of, among other things, ensuring the removal of SLM's confidential and trade secret information from

such devices and accounts while preserving forensic images of the same for purposes of resolving this dispute.

175.   Currie's breaches of her Employment Agreement have directly and proximately resulted in damages to SLM.

**COUNT XI**
**BREACH OF CONTRACT (CURRIE CORPORATE CREDIT CARD USE AGREEMENT)**

176.   SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

177.   The Corporate Credit Card Use Agreement signed by Currie is a valid, binding contract, supported by adequate consideration, and is in full force and effect.

178.   SLM performed all of its duties and obligations under the Corporate Credit Card Use Agreement.

179.   Notwithstanding SLM's performance of its duties and obligations, Currie breached her Corporate Credit Card Use Agreement by:

    a)   effectuating the United Airlines flight credit scheme;

    b)   purchasing an annual WiFi subscription for her United Airlines account to begin after her February 5, 2024 start date with Diamond Assets;

    c)   purchasing flowers on January 22, 2024 for delivery to Ratliff, her admitted "partner in crime," the same date Currie signed her Diamond Assets offer letter and employment agreement; and

    d)   failing to submit an expense report upon request.

180.   Currie's breaches of her Corporate Credit Card Use Agreement have directly and proximately resulted in damages to SLM.

181. SLM is entitled to an award of finance charges and the reasonable attorneys' fees and costs it incurs in bringing this action pursuant to Section 2 of the Corporate Credit Card Use Agreement.

## COUNT XII
## BREACH OF CONTRACT (RATLIFF EMPLOYMENT AGREEMENT)

182. SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

183. The Ratliff Employment Agreement is a valid, binding contract, supported by adequate consideration, and is in full force and effect.

184. SLM performed all of its duties and obligations under the Ratliff Employment Agreement.

185. Notwithstanding SLM's performance of its duties and obligations, Ratliff breached the Ratliff Employment Agreement by, *inter alia*:

a) soliciting SLM's Director of Procurement in December 2023 to leave SLM with her and Currie to join Diamond Assets;

b) Downloading a report of all open SLM opportunities for SLM's entire West Sales Territory, including every account name, the quantities and types of Apple devices, the value of the opportunity, and other detailed information, for improper purposes unrelated to the good-faith performance of her duties as an Officer of SLM; and

c) Filing and pursuing the Ohio Lawsuit in clear violation of the Ratliff Employment Agreement's exclusive venue provision; and

d) Failing to return SLM's confidential and trade secret information to SLM upon demand, including by refusing to make available her personal devices and accounts used by Ratliff for SLM business for purposes of, among other things, ensuring the

removal of SLM's confidential and trade secret information from such devices and accounts while preserving forensic images of the same for purposes of resolving this dispute.

186.     Ratliff's breaches of her Employment Agreement have directly and proximately resulted in damages to SLM.

187.     SLM is entitled to the reasonable attorneys' fees and costs it incurs in bringing this action pursuant to Section 3.5 of the Ratliff Employment Agreement.

188.     SLM also is entitled to injunctive relief pursuant to Section 3.4 of the Ratliff Employment Agreement.

**COUNT XIII**
**BREACH OF CONTRACT**
**(RATLIFF CORPORATE CREDIT CARD USE AGREEMENT)**

189.     SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

190.     The Ratliff Corporate Credit Card Use Agreement is a valid, binding contract, supported by adequate consideration, and is in full force and effect.

191.     SLM performed all of its duties and obligations under the Ratliff Corporate Credit Card Use Agreement.

192.     Notwithstanding SLM's performance of its duties and obligations, Ratliff breached her Corporate Credit Card Use Agreement by purchasing a $125 Nordstrom gift card on January 16, 2024, which she redeemed herself, and by failing to submit an expense report upon request.

193.     Ratliff's breaches of her Corporate Credit Card Use Agreement have directly and proximately resulted in damages to SLM.

194. SLM is entitled to an award of finance charges and the reasonable attorneys' fees and costs it incurs in bringing this action pursuant to Section 2 of the Corporate Credit Card Use Agreement.

## COUNT XIV
## SPOLIATION OF EVIDENCE (CURRIE)

195. SLM re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

196. Currie owed SLM a duty to preserve evidence.

197. Currie her duty to SLM to preserve evidence by submerging her SLM-issued laptop in water for an extended period of time for the purpose of preventing SLM from uncovering the full scope of her misconduct.

198. The loss or destruction of the evidence was the proximate cause of certain of SLM's limitations in proving its claims in this instant cause of action.

199. Currie and Ratliff's spoliation of evidence has directly and proximately resulted in damages to SLM.

## PRAYER FOR RELIEF

WHEREFORE, SLM respectfully prays that the Court enter judgment in its favor and against Defendants on SLM's Complaint and Demand for Jury Trial, as follows:

(a) An Order granting preliminary and permanent injunctive relief, enjoining and restraining the Former Officers from: (i) performing any procurement-related services for Diamond Assets, including, without limitation, in a managerial role, (ii) violating, or participating in the violation of, any of the terms of their respective Employment Agreements; (iii) contacting, soliciting, or servicing any customer, prospective customer, or referral source about whom the Former Officers possessed or learned confidential

information about while employed at SLM, including but not limited to any person listed on any document misappropriated by the Former Officers from SLM; and (iv) utilizing, divulging, disclosing, or misusing any of the Stolen Information or other confidential or trade secret information (as defined in the Currie Employment Agreement and the Ratliff Employment Agreement).

(b)     An Order requiring the following, at the Former Officers' expense: (i) a forensic inspection of all of the Former Officers' personal devices, email accounts, and cloud storage accounts ("devices/accounts"), and any devices/accounts utilized by Currie at Diamond Assets, in order to identify SLM Confidential Information (as defined by the Former Officers' Employment Agreements) and trade secrets.

(c)     An Order requiring the Former Officers to preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained within this Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between the Former Officers; between Diamond Assets and the Former Officers; between the Former Officers and any Diamond Assets employee; and between the Former Officers and any SLM customer, prospective customer, or referral source;

(d)     A judgment against Currie and Ratliff on SLM's claims for breach of fiduciary duties and their tortious conduct in furtherance of their civil conspiracy, in an amount to be proven at trial, including, but not limited to, disgorgement of compensation paid to the Former Officers during periods of such breaches, restitution, compensatory, actual, consequential, exemplary, and punitive damages.

(e)     A judgment against Currie and Ratliff on SLM's claims under the Defend Trade Secrets Act, the Illinois Trade Secrets Act and/or the Ohio Uniform Trade Secrets Act in an amount to be proven at trial, including, but not limited to, restitution, compensatory, actual, consequential, and exemplary damages; the attorneys' fees and costs SLM incurs in bringing this lawsuit.

(f)     A judgment that Currie breached the Currie Employment Agreement and/or the Corporate Credit Card Agreement, in an amount to be proven at trial, including, but not limited to, restitution, compensatory, actual, consequential, and exemplary damages; the attorneys' fees and costs SLM incurs in bringing this lawsuit.

(g)     A judgment that Ratliff breached the Ratliff Employment Agreement and/or the Corporate Credit Card Agreement, in an amount to be proven at trial, including, but not limited to, restitution, compensatory, actual, consequential, and exemplary damages; the attorneys' fees and costs SLM incurs in bringing this lawsuit.

(h)     A judgment in favor SLM on all claims herein based on Currie's deliberate destruction of her SLM-issued MacBook Pro or, in the alternative, an adverse inference jury instruction at trial.

(i)     An Order requiring Currie to pay all expenses associated with SLM's efforts to extract data from Currie's water-damaged, SLM-issued MacBook Pro.

(j)     Expenses and costs incurred by SLM in bringing this action.

(k)     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff SLM demands a trial by jury on all issues in this action.

Dated: March 7, 2024

Respectfully submitted,

/s/ William J. Wortel
One of the Attorneys for Plaintiff,
My Fav Electronics, Inc. d/b/a Second Life Mac

William J. Wortel
Zeke Katz
BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street
Suite 4300
Chicago, Illinois 60601
(312) 602-5000
(312) 602-5050 (facsimile)
bill.wortel@bclplaw.com
zeke.katz@bclplaw.com