**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MY FAV ELECTRONICS, INC. d/b/a** | ) | |
| **SECOND LIFE MAC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.  24 C 1959** |
| | ) | |
| **PAULA B. CURRIE and** | ) | **Judge Rebecca R. Pallmeyer** |
| **MEGAN FINNEGAN-RATLIFF,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendants Paula B. Currie and Megan Finnegan-Ratliff worked for Plaintiff My Fav Electronics, Inc. d/b/a/ Second Life Mac ("Plaintiff" or "SLM") until February of this year, when Currie and Finnegan-Ratliff resigned and went to work for one of SLM's key competitors.  In this action, SLM sues Currie and Finnegan-Ratliff, alleging that Defendants misappropriated trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1986 ("DTSA"), the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq* ("ITSA"), and the Ohio Uniform Trade Secrets Act, RC 1333.61 *et seq* ("OUTSA"); breached their respective contracts with Plaintiff; and committed various other torts.  (*See generally* Compl. [1], 35–50.)  Pursuant to Rule of Civil Procedure 65, SLM now moves for a preliminary injunction barring Defendants from utilizing or disclosing alleged confidential information and trade secrets in their possession.  (Pl.'s Mot. [8], 1, 6.)  In July, this court heard evidence on this motion from Currie, Finnegan-Ratliff, and two SLM executives, Scott Pauga ("Pauga") and Bryan Spears ("Spears").  Following the evidentiary hearings, SLM and Currie submitted closing briefs and accompanying exhibits.  (*See generally* Pl.'s Post Hr'g Mem. [143]; Currie Post Hr'g Br. [142].)

After Plaintiff filed the motion for preliminary injunction, but before the hearings, the parties conferred, and Defendant Finnegan-Ratliff agreed to all of Plaintiff's proposed restrictions on her activities.  (*See id*. at 8–9.)  For now, the court declines to order any further relief against

Finnegan-Ratliff but will consider any submission from Plaintiff showing that additional restrictions are necessary despite her agreement.

Defendant Currie has also agreed to several of the restrictions Plaintiff requests, but contests language that would enjoin her from "[p]erforming any procurement-related services for" her current employer ("Provision 1(a)"),[1] and "[c]ontacting for business purposes . . . any of Plaintiff's customers, prospective customers, or referral sources about whom Defendants learned, while employed by Plaintiff, information not readily known to the public ("Provision 1(c)").[2] (*Id.*) For the reasons explained here, Currie's objections are largely overruled; the motion is granted in part and denied in part with respect to Currie. As the court will discuss, in addition to the provisions that Currie has agreed to, Currie is enjoined and restricted from violating her non-disclosure agreement, utilizing SLM's confidential information, and, for a period of 1 year, soliciting SLM's existing customers.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. SLM and the Apple Device Buyback Industry

Plaintiff SLM is an "Apple device buyback partner": it procures used Apple devices from third parties (whom SLM terms its "customers") and resells the used devices through wholesale and retail channels. (Pauga Decl. ¶ 3.)[3] Since its founding in 2012, a significant portion of SLM's business, as much as 98%, has come from its buyback contracts with schools or school districts

---

[1]     Full text of this requested injunction provision 1(a): "[Defendant is enjoined from] [p]erforming any procurement related services for Diamond Assets, including, without limitation, in a managerial role." (Pl.'s Mot. at 6.)

[2]     Full text of Provision 1(c): "[Defendants are enjoined from] [c]ontacting for business purposes, soliciting, or servicing any of Plaintiff's customers, prospective customers, or referral sources about whom the Defendants learned, while employed by Plaintiff, information not readily known to the public or that constitutes trade secret information, provided that the injunction does not prohibit Defendant Ratliff from communicating with anyone in connection with business unrelated to the procurement of used Apple devices so long as she does not use or disclose any of Plaintiff's trade secret and/or confidential information." (Pl.'s Mot. at 6.)

[3]     Although SLM is technically the buyer in these partnerships, it often uses the terms "sales" interchangeably with "procurement." (Pauga Decl. [9-2] ¶ 5.)

(referred to as the "education vertical"). (*Id.* ¶¶ 3–4, Currie Hr'g Direct Test. (hereinafter "Currie Direct") at 4:20–5:6.) The schools ordinarily use the proceeds from the used devices to purchase a round of new devices. (*Id.*) SLM thus acts as a facilitator for educational institutions who are ready to discard old Apple devices and replace them with new inventory.

The Apple buyback industry is highly competitive, and SLM invests significant resources in identifying prospective customers ("prospecting") and maintaining existing customer relationships. (Pauga Decl.¶¶ 5–6.)[4] This includes "cold calling" prospective customers, educating school technology directors on the buyback process, and cultivating "cross-referral" relationships with the Apple sales representatives who sell new devices to the schools. (*See id.* ¶¶ 6–8.)

SLM's prospecting and procurement processes generate a wealth of data, which SLM collects, organizes, and stores in two main databases: a Google Drive account and a Salesforce database. (*See* Karsten Decl. [9-3], ¶¶ 11, 17). SLM's procurement team collects its data in a variety of ways. Some of the information is collected during the prospecting process, via cold calling and cold emailing, and through interactions at buyback industry trade shows. (*See* Pauga Direct at 8:3–9:8.) Once relationships have been formed with customers, SLM employees will regularly enter new information they learn about the customers into the Salesforce database. (*See id.* at 16:22–17:12).

SLM's procurement data includes the identities of past and prospective customers, along with the identities and preferences of their key decision-makers ("Prospect Information"); identities

---

[4]     SLM organizes its current and prospective customers into three "tiers." Tier 3 clients are schools that publicly solicit bids ("Requests for Proposals" or "RFPs") for sale of their used devices, taking the highest price among many offers; this tier generates the lowest profit margin for SLM. Tier 2 clients also use a bidding process, but generally only entertain "a couple of bids." Tier 1 clients are often repeat customers who accept lower bids for purchase of used devices than SLM would win in an open bidding process. SLM markets to Tier 1 most aggressively. (*See generally* Pauga Hr'g Direct Test at 54:16-56:2.) (hereinafter "Pauga Direct"). SLM asserts that less 15% of its procurement opportunities come from publicly advertised bidding processes by Tier 3 clients. (Pauga Decl. ¶ 10).

of SLM's referral sources[5] and their unique preferences ("Referral Sources"); records of past marketing strategies tailored to specific existing and prospective customers in various territories ("Marketing Strategies"); records of SLM's customer targets, business plans, and strategies ("Future Business Plans"); compilations of SLM's profit margins, pricing strategies, and pricing and sales practices for each past sale ("Sales Information")[6]; and personnel training material and compensation plans ("Personnel Information").  (*See generally* Compl. ¶ 22; Pauga Decl. ¶ 16.) SLM's procurement officers utilize this information to make competitive offers to prospective customers.  For example, by developing "win/loss" records for a particular market or territory, SLM can make "dynamic adjustments" to its procurement personnel headcounts, compensation plans, marketing budgets, and pricing to maximize profits.  (*See* Pauga Decl. ¶ 13.)

SLM takes steps to ensure that its procurement data remains confidential:  SLM employees are required to sign employment agreements that include robust non-disclosure and non-use provisions and require the return of any confidential information at the termination of employment.  (*Id.* ¶ 19; *see also* Currie Non-Disclosure Agreement [9-4].)  SLM's employee handbook also stresses the importance of maintaining confidentiality.  (Pauga Decl. ¶ 20.) Additionally, some files are password-protected, and SLM's network is protected by a firewall and accessible only with multi-factor authentication.  (Karsten Decl. ¶ 7.)  Employee access to computer systems and servers is terminated promptly following the end of employment, and SLM-provided laptops and tablets are collected immediately upon separation of employment, if not earlier.  (Pauga Decl. ¶ 22.)

---

[5]    Referral sources in the context of the buyback business include both Apple sales representatives, customers who SLM may ask to refer them to other customers, and (described vaguely) "other people that work with a K through 12 school district."  (*See* Spears Direct (hereinafter "Spears Direct") at 9:3–6, Currie Cross at 83:1–8.)

[6]    SLM seems to have used at least four pricing models for buybacks.  The commonly used "graded" approach created a sliding scale of prices for devices graded A through F based on the condition of the equipment being purchased.  *See* (Pl.'s Hr'g Ex. 381 [122]; Finnegan-Ratliff Direct at 49:8–50:2.)  SLM would sometimes also use a "3 Tier" pricing model, a "pass-fail" grading approach, or occasionally, offer a "lump sum" for an entire order.  (*See* Pl.'s Hr'g Ex. 381.)

## II.    Currie and Finnegan-Ratliff's Employment with SLM

Defendants and Finnegan-Ratliff joined SLM's procurement team in 2019.  Finnegan-Ratliff was hired in March of 2019 as a Director of Procurement and was later promoted to Regional Vice President (East) of Procurement in October 2023.  (*Id*. ¶ 26.)  In April 2019, SLM hired Currie to serve as its Vice President of Procurement, a role in which she was responsible for managing various sales executives throughout the country, maintaining customer and referral relationships, and setting strategic goals for Procurement.  (*Id*. ¶¶ 23, 24.)  Finnegan-Ratliff had those same responsibilities, albeit limited to the eastern United States.  (*See id*. ¶ 26.)  Prior to joining SLM, both Currie and Finnegan-Ratliff had worked as sales representatives at Apple, with experience selling new Apple devices to schools.  (Currie Direct at 3:15–24, Finnegan-Ratliff Hr'g Direct Test. (hereinafter "Finnegan-Ratliff Direct") at 3:16–25.)  Defendants are also close personal friends.  (Finnegan-Ratliff Direct at 135: –11.)

Defendants, in their respective procurement leadership capacities, had access to what SLM considers sensitive trade secret and confidential information.  (Pauga Decl. ¶ 29.)  Currie signed a non-disclosure agreement prohibiting her from divulging SLM's confidential information, and requiring her to return all documents, notes, equipment, drawings, and materials received from SLM upon termination of her contract.  (*See* Currie Non-Disclosure Agreement [9-4] (hereinafter "Currie NDA.") at 1–2.)  Finnegan-Ratliff did not sign a non-disclosure agreement, but her employment contract contained a non-disclosure provision with effectively the same terms.  (*See* Finnegan-Ratliff Employment Agreement [9-5], ¶ 2.2.)  Finnegan-Ratliff's employment agreement also included a non-compete provision, which bars her from working for 11 specific competitors, listed by name in the agreement, for a period of one year after her last day of employment with SLM, and a non-solicitation provision, which barred her from pursuing business with SLM's customers or prospective customers.  (*Id.* ¶¶ 2.4, 2.5.)

In January of 2024, the relationship between SLM and Defendant Currie soured.  At a meeting on January 10, 2024, SLM executives Pauga and Spears informed Currie that moving

forward, Currie "would not be in the leadership seat or leading procurement." (*See* Currie Direct at 9:8–10; Pauga Hr'g Cross Test. [hereinafter "Pauga Cross"] at 20:2–12.) Currie saw the meeting as a "demotion." (*See id*. at 6:11–13.) The following day, Currie contacted Diamond Assets, LLC ("Diamond Assets"), one of SLM's most significant competitors in the education buyback market; indeed, Diamond Assets is the first competitor listed in the non-compete provision signed by Finnegan-Ratliff. (*Id*. at 15:19–22; *see also* Pauga Decl. ¶ 32.) On January 22, 2024, Currie signed a letter agreeing to serve as Diamond Assets' Senior Vice President of Procurement and Education on January 22, 2024. (Currie Direct at 15:25–16:6.) The responsibilities of this role at Diamond Assets were nearly identical to those that Currie had performed at SLM. (Currie Direct at 16:11–15.) Currie's new job at Diamond Assets would begin on February 5, 2024. (*Id.* at 40:9–11.)

Four days after Currie signed her offer letter, on January 5, 2024, both Currie and Finnegan-Ratliff tendered their resignations to SLM, to be effective February 9, 2024. (*See* Currie Direct at 16:17–20; Finnegan-Ratliff Direct at 82:14–83.12; Pl.'s Mem. at 12.) Finnegan-Ratliff also hoped to work with Currie in her new position at Diamond Assets, but understood that she was barred from doing so, at least in principle, by the non-compete provision of her employment agreement with SLM. (Finnegan-Ratliff Direct at 69:19–25.) It is unclear from the record whether Finnegan-Ratliff ever accepted a position with Diamond Assets.

### III.    Currie and Finnegan-Ratliff's Alleged Theft of Confidential Information and Trade Secrets

Most of the alleged conduct that led to this lawsuit and SLM's motion took place between January 10, 2024, the day of Currie's perceived demotion at SLM, and February 17, 2024. SLM asserts that in the weeks leading up to Currie and Finnegan-Ratliff's departures, Defendants downloaded a trove of SLM documents that included confidential information and trade secrets. (*See* Compl. ¶ 36.) SLM alleges that Defendants then took these documents for the purpose of disclosing them to Diamond Assets and giving it a competitive advantage against SLM. (*See*

Compl. ¶ 38.)  Currie and Finnegan-Ratliff do not appear to deny that they took the information that SLM has identified.  (*See, e.g.*, Currie Direct 134:5–135:15).  Instead, as more fully discussed below, Defendants challenge SLM's contention that the information was "confidential" within the meaning of their employment contracts with SLM or amounted to trade secrets under applicable law.  (Currie Opp'n [36], 2-7).  Defendants (or at least Currie) also insist that they took the information in part because it might be useful in defending themselves against liability if SLM were sued over some of its business practices.[7]  (*See, e.g.*, Currie Direct. 58:19–60:2).

Soon after the January 10 "demotion" meeting, Currie began to save various documents belonging to SLM onto her personal devices.  (Currie Direct at 88:13–17.)  For instance, on January 15, Currie downloaded an SLM file that she renamed "Nick Graduation 2," in an admitted effort to lead an observer to believe the file related to her son, Nick, and thus "avoid detection by SLM."  (*Id*. at 5:15–25.)  In fact, the downloaded file is a spreadsheet containing a record of every deal SLM had closed in the 2023.  (*Id*. at 89:12-25.)  SLM further alleges that between January 20 and the tendering of Defendants' resignations on January 26, 2024, Currie and Finnegan-Ratliff emailed to their personal addresses or otherwise downloaded dozens of other SLM files, which contained customer lists (Pl.'s Hr'g Ex. 386 [123], 8–50), "win/loss" records by territory (*e.g. id*. at 5–6), leads for prospective "high-value" customers (*e.g.* Pl.'s Hr'g Ex. 300 [107]), strategic forecasts for 2024 (*e.g.* Pl.'s Hr'g Ex. 380 [121], 1–2), and more.  (*See generally* Karsten Decl. ¶¶ 6–12 (summarizing documents downloaded by Defendants).  On January 22, 2024 (before Currie resigned from SLM), Currie also texted Diamond McKenna, the CEO of Diamond Assets,

---

[7]       In the time since the instant Motion was filed and the evidentiary hearings took place, Currie and Finnegan-Ratliff have filed counterclaims against SLM and Pauga in relation to these alleged business practices.  *See generally* Def.'s Counterclaim [178].  The counterclaims allege, in part, that practices dictated by Pauga and Spears of SLM "resulted in a pattern of fraudulent conduct" including but not limited to "creating fraudulent device audits, failing to complete audits, paying Suppliers based upon false, incomplete, or inaccurate audits, falsifying the basis for non-payment of minimum guarantees, and misrepresenting that SLM wipes student data from devices before they are resold."  *Id.* ¶ 61.  How the documents taken by Defendants would have provided a defense to any claims against Defendants themselves is unclear to the court.

advising McKenna that Pauga and SLM would not be aggressive in pursuing a particular model of Apple devices on the market based on SLM's current inventory. (Pl.'s Hr'g Ex. 201 at 11; Currie Direct 20:25–22:7.)

On January 27, 2024, the day after Currie and Finnegan-Ratliff resigned from SLM, Finnegan-Ratliff purchased a two-terabyte external hard drive (*See* Pl.'s Mem. Ex. 9 [9-9]); she later confirmed in text messages with friends that she was "trying to get everything loaded off my computer" (Pl.'s Mem. Ex. 10 [9-10]) and that she had quit her job but was "in the process of getting everything downloaded before they shut me down." (Pl.'s Mem. Ex. 11.) It appears that Defendants, between the two of them, saved to this external hard drive additional copies of most if not all of the files they had downloaded from SLM's databases.

Unaware of this conduct and Defendants' retention of its data, on January 31, 2024, SLM sent Defendants a demand that they return their laptops and other SLM-provided devices. (*See* Klaczak Decl. [9-12], ¶ 3.) When Currie ultimately returned her SLM-issued laptop, it had "extensive water damage and damage to the chassis." (*Id.* ¶ 5(a).)[8] Currie's husband (himself a lawyer, and apparently communicating on Carrie's behalf) explained to SLM that Currie had dropped the laptop in the bathtub weeks earlier. (Pl.'s Mem. at 18; *see also* Currie Direct at 120:17–121:22 (reiterating that her SLM-issued laptop fell into her bathtub "at some point during the second half of January").) Any data on the laptop could not be accessed because of the extensive water damage. (Klaczak Decl. ¶ 5(c).) Finnegan-Ratliff turned over her SLM-issued laptop, but either would not or could not provide the correct login credentials; Finnegan-Ratliff has claimed she could not remember them because had not used her SLM-issued laptop since 2019. (*Id.* ¶ 5(d); Finnegan-Ratliff Direct at 105:19–107:2).) Defendants also initially refused to let SLM inspect their personal devices, which they regularly (or in Finnegan-Ratliff's case, always) used

---

[8]     It is not clear from the parties' briefing or the evidence in the record exactly when Currie returned this laptop. Plaintiff has clarified only that the laptop had not been returned as of February 6, 2024. (Klaczak Decl. ¶ 4.)

for SLM business. (*See* Currie Direct 72:22–24 (Currie used her iPad Pro "a lot" for SLM business"); Finnegan-Ratliff Direct at 126:17 ("My personal laptop [] was also my work laptop").)[9] Defendants eventually agreed to provide their personal devices for inspection on March 14, 2024, after this suit was filed, although it would take another month for the parties to agree on the terms for SLM's examination of the devices. (Pl.'s Mem. at 18; Currie Opp'n at 7.) SLM claims that Defendants' conduct regarding their SLM-issued and personal devices was part of a continuing scheme to "prevent SLM from ascertaining the full scope of [Defendants'] use and disclosure of [SLM's] trade secret and confidential information." (*Id.* at 17.)

Currie provides a different explanation for her taking of SLM's data, at least in part. She testified that she was concerned that some of SLM's business practices would expose SLM to civil and/or criminal lawsuits, and that she downloaded SLM's data to help protect herself from potential liability. (*See* Currie Hr'g Cross Test. (hereinafter "Currie Cross") at 68:9–69:17.) According to Currie, all of the SLM data she and Finnegan-Ratliff took was saved to the external hard drive Finnegan-Ratliff had purchased, and that hard drive was later provided to an attorney in Columbus, Ohio in February 2024 for safekeeping and in anticipation of litigation. (*Id.* at 69:18–22, 70:8–22; Currie Cross at 69:10–19.) Currie explained that she believes this "self-help approach" was appropriate because she did not know whether the data would otherwise be preserved by SLM, such that it would emerge in the discovery process for the hypothetical, future litigation. (Currie Direct at 60:1–18.)

Whatever the reason Currie may have had for turning information over to counsel, it appears she did have at least some continued access to SLM's data after that point. At times, Currie testified that she had been cut off from access to SLM's databases and her SLM email account since January 26, 2024 (Currie Direct at 69:23–70:7), and that all the devices she had

---

[9]     It is not clear from the record why Currie and Finnegan-Ratliff frequently or exclusively used their personal devices for SLM business; it is also unclear whether this raised any concerns within SLM before the events underlying this litigation took place.

used while at SLM and during January 2024 were either returned to SLM or handed over to the attorney in Columbus, Ohio by February 12, 2024. (*Id.* at 71:9–12.) But when questioned by Plaintiff's counsel, Currie admitted that she had not actually turned over her personal iPad, which she used frequently for SLM business, until April 25, 2024, nearly a month after returning the last of her other devices. (*See* Currie Direct at 123:11–24.) And, as SLM demonstrated, metadata from several of the SLM files on Currie's iPad showed the dates and times when the documents were last modified, and by whom, and appear to confirm that Currie had continued access to SLM data. (*See id.* at 65:18–20.) For example, Plaintiff's counsel demonstrated that an Excel spreadsheet containing SLM's "2024 Forecast," client lists, and win/loss records (Pl.'s Hr'g Ex. 380) was accessed just an hour before a strategy call that Currie attended with a procurement executive at Diamond Assets on February 7, 2024. (*See* Currie Direct. at 65:7–66:15.) Currie denied having accessed the spreadsheet at that time but could not explain why the file's metadata suggests that she had done so. (*Id.*) In addition, Plaintiff noted metadata showing that Currie, or someone using her device, was editing spreadsheets she had taken from SLM files as late as February 17, 2024, just before another meeting at Diamond Assets that Currie attended. (*See id.* at 140:21–141:22.) Currie again denied that she accessed and/or edited these documents at the time indicated but, again, could not provide an alternative explanation for the metadata. (*Id.*)

## IV.    Procedural History

On March 7, 2024, Plaintiff filed a Complaint alleging that Defendants had violated ITSA and DTSA and asserting related state trade secret, breach of contract, and tort claims. (*See generally* Compl. ¶¶ 35-50.) On April 1, 2024, Plaintiff moved for a preliminary injunction against both Defendants. (Pl.'s Mot. at 1, 6.) As noted, Defendant Finnegan-Ratliff has agreed to all of the eight restrictions SLM sought, on the condition that she not be prohibited from communicating with any customer regarding business unrelated to used Apple devices. (*See* Pl.'s Mem. at 19.) Currie, contests provisions just two of the restrictions SLM seeks, set forth in paragraphs 1(a) and 1(c) of SLM's motion. (*See id.*) Defendants filed a joint Answer [29] and Defendant Currie

filed a memorandum in opposition to the preliminary injunction [36]. The court held evidentiary hearings on the motion on June 27-28 and July 2, 2024.

<u>DISCUSSION</u>

A preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023). To obtain a preliminary injunction, a plaintiff must show (1) that it has some likelihood of success on the merits of its claim; (2) that it has no adequate remedy at law, and (3) that without preliminary injunctive relief, it would suffer irreparable harm. *Id.* "If the plaintiff establishes these threshold requirements, the court must then balance the equities, weighing the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party and the public— including third parties—if it is granted." *Id.* The balancing process calls for a "sliding scale" approach; "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Grp., Inc.,* 237 F.3d 891, 895 (7th Cir. 2001). The court addresses these elements in turn, beginning with the likelihood of success on the merits of Plaintiff's claims. For now, as explained earlier, the court's analysis is applied only to Currie.

**I.      Likelihood of Success on the Merits**

At the threshold stage, a plaintiff moving for preliminary injunctive relief need not show that it "definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Rather, the movant need only demonstrate that the likelihood exceeds "a mere possibility of success." *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022). As explained here, Plaintiff has met the threshold requirement for likelihood of success on the merits, both as to its trade secrets claims under the ITSA and DTSA, as well as its claim for breach of contract.

Parties seeking injunctions under the ITSA and DTSA "must prove both the existence of a trade secret and an actual or threatened misappropriation" of the trade secret. *Stenstrom Petroleum Servs. Grp., Inc. v. Mesch*, 375 Ill. App. 3d 1077, 1097, 874 N.E.2d 959, 977 (2d Dist.

2007) (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995)); *see also* 18 U.S.C. § 1836(b)(3)(A). [10]

Currie's NDA required her to "hold the Confidential Information received from [Plaintiff] in strict confidence," not "disclose or divulge" the Confidential Information to others without SLM's consent, and not "reproduce the Confidential Information" nor use it commercially or for any purpose other than the performance of her duties with SLM. (Currie NDA at 1.) Alleged misappropriate and improper disclosure are relevant both to breach of contract and trade secret claims; the court addresses those first, then turns to the question whether the documents at issue here are likely trade secrets and qualify as confidential information under Currie's NDA.

## A. Misappropriation and Disclosure

Misappropriation includes the "disclosure or use of a trade secret" without the consent of the owner by someone who, "at the time of the disclosure or use, knew or had reason to know" that knowledge of the trade secret was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." 765 ILCS 1065/2(b)(2); 18 U.S.C. § 1839(5). Based on the language of Currie's NDA detailed above, the court finds that conduct qualifying as misappropriation under the trade secrets statutes would very likely also qualify as improper disclosure and use under the contractual terms.

Currie's conduct has very likely satisfied the "actual" misappropriation element of the trade

---

[10]     Over the years, the Illinois courts have developed useful guidelines to structure this fact-intensive inquiry, building on principles laid out in the First Restatement of Torts. *See ILG Indus., Inc. v. Scott*, 49 Ill.2d 88, 93, 273 N.E.2d 393, 396 (1971) (adopting six factors suggested by the First Restatement to determine "whether given information is [a] trade secret"); *Alpha School Bus Co., Inc. v. Wagner*, 391 Ill. App. 3d 722, 740, 910 N.E. 2d 1134, 1152 (1st Dist. 2009) (listing First Restatement factors and collecting cases). Seventh Circuit caselaw on the DTSA is more limited. *See Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 480 (7th Cir. 2024) (explaining that the DTSA, which created a federal "private right of action" for trade secret misappropriation, only took effect in May 2016). The court is thus guided by the well-developed Illinois case law with respect to both the ITSA and DTSA claims. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003) (taking the "common law factors" from Illinois case law as "instructive guidelines for ascertaining whether a trade secret exists.")

secrets statutes.  Currie does not appear to dispute that she took the documents identified by Plaintiff.  (Currie Direct at 134:5–135:10.)  There is very strong evidence that Currie used at least two of the Excel files she took from SLM after starting work for Diamond Assets.  *See supra* p. 10 (metadata of SLM Excel files indicates that Currie accessed these documents immediately before meetings at Diamond Assets in February 2024); (Currie Post Hr'g Closing Br. at 8 (acknowledging that SLM has produced evidence that Currie opened these documents in February 2024).) Finally, notwithstanding Currie's claim that she did not and does not personally believe she is restricted in any way from using or disclosing any information" she learned at SLM (Currie Direct at 132:17–133:16), the court finds that Currie had reason to know, as a general matter, that she acquired SLM's information under such conditions because she signed an NDA to that effect.

SLM is also likely to succeed on its arguments regarding "threatened" misappropriation by Currie, pursuant to the "inevitable disclosure" doctrine.  Under this doctrine, "a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets."  *PepsiCo*, 54 F.3d at 1269.  The fact that a person "assumed a similar position at a competitor" is relevant but does not, without more, make disclosure inevitable.  *Id*.  Courts also consider "the level of competition between the parties, and the new employer's actions to prevent unlawful disclosure of trade secrets."  *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 284, 827 N.E.2d 909, 927-28 (1st Dist. 2005).  Here, Currie has admitted that her responsibilities in her new role at Diamond Assets, by and large, "are the same as they were" in her previous role at SLM.  (Currie Direct 16:11–16.)  She has admitted that Diamond Assets is "SLM's most significant direct competitor."  (Answer at 5–6.)  And Currie has not produced any evidence that Diamond Assets has taken steps to prevent the disclosure of SLM's trade secrets.

Currie's initial memorandum in opposition to this Motion does not mention the inevitable disclosure doctrine at all, and Currie's post-evidentiary hearing briefing makes nothing more than a perfunctory reference to it.  In that briefing, Currie first contends that SLM is improperly claiming

trade secret protection over the entirety of its Salesforce (or "CRM") database—which is plainly inaccurate, as a factual matter—before claiming, without citing any authority, that the inevitable disclosure doctrine does not apply to such compilations of information. (*See* Currie Post Hr'g Closing Br. at 10.) Currie then argues, citing this court's decision in *SKF USA, Inc. v. Bjerkness*, that it is not inevitable Currie would rely on SLM's documents because she is a "former Apple representative and executive in the buyback space with years of experience" who could perform procurement duties without the SLM materials. (*Id.* at 10 (citing 636 F.Supp.2d 696, 717 (N.D. Ill. 2009)).) But *Bjerkness* is clearly distinguishable. In that case, the plaintiff had "presented virtually no evidence of actual use" of its trade secrets by defendants. *Id.* at 716. Here, SLM *has* presented strong evidence of actual use of its claimed secrets by Currie. While it may be that Currie's personal knowledge and skill would allow her to do a fine job at Diamond Assets without using SLM's information, SLM has made a strong case that Currie is, in fact, very willing to use SLM's information to *improve* her performance at Diamond Assets.

### B.    Existence of Trade Secrets

With the issue of misappropriation settled, the court turns to Currie's chief defense on the merits: that the documents she took from SLM neither qualify as trade secrets under the ITSA and DTSA, nor as "Confidential Information" under her NDA. (Currie Opp'n [36] at 1-4, 6-7; Currie Post Hr'g Closing Br. at 3–6; Currie Direct at 134:2–4 (Currie's testimony that "SLM has any competitively valuable information" to be misappropriated)).) The court disagrees.

The definition of a trade secret under the ITSA and the DTSA is "materially identical." *Life Spine*, 8 F.4th at 540. Each statute asks whether:

> (1) "the owner [of the claimed trade secret] . . . has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

*Id.* (quoting 18 U.S.C. § 1839(3) and 765 ILCS 1065/2). Under both statutes, whether a particular piece of information is a trade secret "is a question of fact that requires an ad hoc evaluation of

all the surrounding circumstances." *Id.* The Currie NDA defines "Confidential Information" broadly as "information and data of any kind concerning any matters affecting or relating to My Fav Electronic INC, the business or operations of My Fav Electronics INC, and/or the products, drawings, plans, processes, or other data of My Fav Electronics INC not generally known or available outside the company." (Currie NDA at 2.)

Given the breadth of this definition, any document or aggregated information that would qualify as a trade secret under the relevant statutes would also qualify as "Confidential Information" under the Currie NDA. Both the NDA and the statutes apply to information "not generally known" outside the company. The trade secret statutes require, in addition, that the information have been reasonably well guarded and derive some economic value from not being readily ascertainable to competitors. The court therefore conducts an analysis under the ITSA/DTSA definitional framework for trade secrets to ascertain the merits of Plaintiff's claim.

At least some of the documents that Defendant Currie admittedly took from Plaintiff meet the statutory definition of a trade secret. As explained below, Plaintiff took reasonable measures to protect of all the documents at issue in this case, and Plaintiff has shown a clear likelihood that several of these documents were not readily available to competitors and had competitive value. In this regard, it is worth noting that Currie has taken a "divide and conquer" approach, breaking the information and documents she seized into component parts, and arguing that *some* of that material was not adequately protected or otherwise was readily ascertainable by competitors through independent means. The Seventh Circuit has long held, however, that a trade secret can exist "in a combination of characteristics and components, each of which, by itself" is not protected, so long as the combination has competitive value. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 540–41 (7th Cir. 2021) (quoting *3M v. Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001)). As Illinois courts have put it: "when individual pieces of information are compiled and organized at a single location," the compilation is "much more valuable and useful than each piece of information individually," particularly where "the *compiled* form is not easily obtained or accessible

to the public." *The Agency, Inc. v. Grove*, 839 N.E.2d 606, 617, 362 Ill.App.3d 206 (2nd. Dist. 2005) (emphasis added). At this stage, an exhaustive accounting of every single document in the compilation that Defendant Currie took[11] from Plaintiff is not necessary: a subset, examined here, amply satisfies the threshold requirement for likelihood of success on the merits, and allows the court to fairly weigh that likelihood at the balancing stage of the preliminary injunction inquiry. (*Accord* Currie Post Hr'g Closing Br. at 2 (quoting *Insulet Corp. v. EOFlow, Co. Ltd.*, 104 F.4th 873, 881 (Fed. Cir. 2024) (In order to obtain a preliminary injunction, SLM need only "establish the likelihood of success on the merits" for "one, specifically defined, trade secret").)

### 1.    Reasonable Measures to Keep Information Secret

Perhaps the most important measure an employer can take to keep its information secret is to impose confidentiality obligations on employees who have access to that information. The formation of a confidential relationship "imposes upon the disclosee the duty to maintain the information received in the utmost secrecy." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 726 (7th Cir. 2003). Indeed, even information kept under digital lock and key might not be sufficiently protected unless the employees who can access the information have notice that it is confidential. *See Brian J. Wanca, J.D., P.C. v. Oppenheim,* 226 N.E.3d 732, 742, 2023 IL App (1st) 220273 (2023) (client lists stored in limited-access database protected by two-factor authentication were not adequately protected because none of the documents "contained any disclaimers or warnings that they contained confidential information or that they should not be shared," and defendant was "never instructed" not to share the lists with others).

In this case, Defendant Currie signed a non-disclosure agreement when she began to work for Plaintiff. (*See* Currie Non-Disclosure Agreement [1-2].) Currie has not contested Plaintiff's assertion that she was one of only "certain employees" who had access to Plaintiff's

---

[11]    The bulk, if not the entirety, of the claimed trade secrets that Currie and Finnegan-Ratliff allegedly misappropriated are contained in four Excel files that SLM has submitted to the court under seal. (*See* Pl.'s Hr'g Ex. 377 [120], 380 [121], 381 [122], 386 [123].) Across the four files, there are over 40 spreadsheet tabs of information.

Google Drive and Salesforce databases (or at least to certain portions of them). (Pl.'s Mem. At 7.) Instead, Currie contends that Plaintiff's efforts to protect the information was inadequate because (i) Currie received "access to the computer files, databases and information underlying the Motion" *before* she "signed an NDA or confidentiality agreement," and (ii) Plaintiff disclosed some of the information at issue to school districts as part of Plaintiff's bids for business, and those school districts were not under confidentiality obligations to Plaintiff. (Currie Opp'n at 8.) Neither argument is persuasive.

### a.    Currie's Database Access

To begin, it is far from clear that Defendant Currie gained access to Plaintiff's databases before she signed her NDA.[12]  But even if Currie did not sign it until April 24, 2019, this would not defeat Plaintiff's claim that the particular documents that Currie misappropriated were adequately protected. *See Oppenheim*, 226 N.E. 3d at 742, 2023 IL App (1st) 220273 ¶ 34 (plaintiff's "entire database" was "not at issue" where trade secrets claims turned on three specific documents pulled from the database). In any event, most of the information that Defendant Currie took was not even generated until after she was hired, and well after she signed the NDA. (*See* Currie Direct 134:5–135:10; Pl.'s Reply at 4–5.)

In support of her argument that the documents are not protectable, Currie cites *StorageCraft Tech. Corp. v. Persistent Telecom Solutions, Inc.*, No. 2:14CV76 DAK, 2015 WL 9592517 (D. Utah Dec. 31, 2015), but that case is distinguishable. In *StorageCraft*, the Persistent, as counterclaimant, challenged StorageCraft's use of trade secrets that Persistent had shared with StorageCraft in 2009—specifically, a "demo account" for cloud-based software that

---

[12]  The parties agree that Plaintiff hired Defendant Currie "on or about April 1, 2019." (Compl. ¶ 25; Answer [29] at 11.)  At the evidentiary hearing, Defendant Currie claimed that she had not signed the NDA until April 24, 2019. (Currie Direct 131:5-7, 132:9-11).  The face of the signed NDA, however, reflects that the Defendant signed the document on April 2, 2019; indeed, Currie has confirmed that it is her handwriting on the NDA indicating a signing date of April 2. (*Id.* 131:8:14.)

Persistent had developed.  *Id.* at *2, 5.  But the parties did not sign an NDA until the following year, and that NDA made no reference to the demo account, instead protecting "the parties' subsequent discussions regarding the possibility" of Persistent developing a new version of its product for StorageCraft.  *Id.* at *3.  The court concluded held that StorageCraft therefore had no obligation to keep confidential information that it gained by using the demo account.  *Id.* at *7.  In the instant case, Currie gained access to many (if not all) of the claimed trade secrets well after she signed an NDA.  The fact that she may have briefly been able to access Plaintiff's databases *before* that time does not alter the analysis.

### b.    Disclosures to school districts

Currie also argues that disclosure of certain information to school districts undermines Plaintiff's trade secrets claim.  Thus, she notes that (a) Plaintiff submitted bids to various school districts for Apple device buyback contracts, (b) Plaintiff "did not require that the school districts withhold the terms of their bids and information contained therein," and (c) "the bids were made public at the time of the award."  (Currie Opp'n at 2.)  Assuming these assertions are true, they do not defeat Plaintiff's claim for two reasons.  First, even if SLM disclosed a set of data points to school districts in the bidding process—say, proposed pricing models for each bid based on the conditions of the devices, *see supra* p.4 n.5—that data would presumably be disclosed only on a piecemeal basis by the school districts.  Trawling through the contents of those publicly released bids to compile spreadsheets organizing the contents of SLM's bids would require significant effort, such that those compilations of data could still merit trade secret protection, and SLM's efforts to guard the *compilations* would still be relevant.  Second, SLM documents that reflect the results of SLMs contract bids (such as order lists and customer lists) make up only a portion of Plaintiff's claimed trade secrets in this litigation.

Currie is correct that when a plaintiff "discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002

(1984)).  But again, a compilation of data points, none of which individually constitute trade secrets, can still garner trade secret protection.  *See supra* p. 13.  The operative question in this analysis is therefore whether the *compilations* of SLM's bid contents were reasonably well-guarded.  *See Life Spine,* 8 F.4th at 540 ("a limited disclosure does not destroy all trade secret protection in a product.")  Currie has not addressed that point in her briefing at all.

In any case, the compiled results and/or contents of Plaintiff's bids make up, at best, a part of Plaintiff's claimed trade secrets. As the court will explain in more detail below, the documents Currie took also include customer lists from 2020 through 2023, as well as forward-looking strategy documents for 2024, all of which likely merit trade secret protection.

Currie cites *Southwest Stainless, LP v. Sappington* for the proposition that disclosing information to a customer without a confidentiality agreement in place can rob that information of trade secret status.  582 F.3d 1176, 1190 (10th Cir. 2009); (Currie Opp'n at 2).  But *Sappington,* too, is distinguishable:  plaintiff there claimed trade secret protection over a single quote it had provided to a single customer for a single order of metal products—in other words, the plaintiff argued that the content of one bid for a contract, *on its own*, was a trade secret.  582 F.3d at 1182.  As explained above, in this case, Plaintiff's claimed trade secrets encompass far more than the contents of any single bid it previously submitted to a school district.

The court concludes that Plaintiff made reasonable efforts to protect its claimed trade secrets.

### 2.    Competitive Value and Ascertainability to Competitors

If an employer has invested "substantial time, money, and effort to obtain a secret advantage," that fact will weigh in favor of finding the existence of a trade secret.  *Oppenheim*, 226 N.E. 3d at 742, 2023 IL App(1st) 220273, ¶ 33.  Indeed, one of the chief purposes of trade secrets law is to "encourage invention and innovation" by protecting such investments.  *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995).  By contrast, where "information can be readily duplicated without involving considerable time, effort or expense, it is not a trade

secret." *Oppenheim*, 226 N.E. 3d at 742, 2023 IL App(1st) 220273, ¶ 33.

Plaintiff has demonstrated that at least some of the documents at issue in this case were developed with considerable effort, could not be easily reproduced by a competitor (if at all), and are competitively valuable. In making this determination, the court considers two categories of documents that include information claimed as trade secrets. The first category includes documents that record Plaintiff's assessments of and notes on specific, upcoming contract opportunities for Fiscal Year ("FY") 2024. *See Total Staffing Sols., Inc. v. Staffing, Inc.,* 227 N.E.3d 14, 28, 2023 IL App (1st) 220533 ¶ 37 (2023) ("Generally, an employee whose employment has terminated may not take confidential particularized plans . . . developed by his employer.") The second category includes documents reflecting Plaintiff's contacts with Apple sales representatives in the educational sector, and Plaintiff's dealings with particular customers. Based on the evidence before the court, these may not be the only documents worth of protection but are sufficient to merit imposition of injunctive relief.

### a.    SLM's FY 2024 Opportunities

### i.    SLM 2024 Forecast

Most significant among the documents Currie took from Plaintiff is a tab titled "2024 Forecast," embedded within a document the parties refer to as the "southwest territory spreadsheet." (Pl.'s Hr'g Ex. 380.) This spreadsheet contains information regarding 15 specific contract opportunities that Plaintiff anticipated competing for during Fiscal Year 2024. Crucially, the 2024 Forecast also includes Plaintiff's contemporaneous assessments of how likely it was to win each contract, as well as its notes about each customer's needs.[13] For example, one entry

---

[13]    The likelihood of winning each contract is expressed in percentage values, which in turn represent the progress made on the potential deal. A value of 10 percent signifies a potential lead. When there was "contact made" the value increased to 25 percent. A value of 50 percent means engagement with the client. 75 percent means [SLM is] "in negotiation with the prospect." (Finnegan-Ratliff Direct at 41:4–21; Pauga Decl. at ¶ 38.) In at least some cases, Currie and Finnegan-Ratliff themselves would make these assessments, although they also

in the Forecast regards an opportunity with the G.C. Consolidated Independent School District,[14] a repeat customer of Plaintiff's. The spreadsheet shows that Plaintiff was in active negotiations with G.C. and expected to procure "a round of iPads" in summer 2024, "pending bond passing."[15] (*Id.*) Meanwhile, a different row of the spreadsheet describes an opportunity with P.C. Schools in another state. The entry notes that Plaintiff had only made initial contact regarding this opportunity, and that although P.C. was a repeat customer, Plaintiff expected the bidding process to be "competitive." (*Id.*)

Currie has admitted that the information in the 2024 Forecast would be "particularly important" for her to have at Diamond Assets. (Currie Direct 66:18–67:10.) And one can see why it would be valuable to a competitor: using the Forecast, another firm could make well-informed decisions about how to expend its resources in 2024. If Plaintiff was already quite close to a deal with G.C., it might not make sense for a competitor to pursue that school district in 2024. Instead, that competitor might decide to invest time and effort into prying away P.C. Schools, a previous customer of Plaintiff's who nonetheless was keeping its options open in 2024.

### ii.     "Hot Leads"/ "Whale Leads"

Another document taken by Currie with clear and immediate value to a competitor is a list of "hot leads" or "whale leads" developed by Plaintiffs in late 2023. *See* (Pl.'s Hr'g Ex. 300 [107]; Currie Direct 124:2–14.) This document, somewhat akin to the 2024 Forecast, compiles 25

---

appeared to rely on the procurement employees who reported to them to help make the determinations. (*See* Finnegan-Ratliff Direct 30:11–14; 54:1–7.)

[14]     Plaintiff has submitted these records to the court under seal. Material or information that is necessary for the court's ruling will be disclosed; but to the extent such disclosure is not necessary for an understanding of the ruling, the court will disguise the identity of Plaintiff's customers.

[15]     Texas school districts sometimes issue voter-approved bonds to raise money for purchases. *See* TEX. STATE BD. ED., *IRS Action Increases Bond Guarantee Program Capacity*, https://sboe.texas.gov/state-board-of-education/sboe-news/irs-action-increases-bond-guarantee-program-capacity#:~:text=The%20Bond%20Guarantee%20Program%20guarantees%20bonds%20issued%20by (May 11, 2023).

specific, early-stage opportunities that Plaintiff viewed as promising (and presumably, very promising in terms of upside, given the "whale" moniker).  The list includes the name and email addresses of contact persons associated with the opportunities, as well as the date that Plaintiff had last sent an email to that person.  As Defendant Currie testified, Plaintiff's list of "hot" or "whale" leads would clearly be helpful to a competitor: it would allow the competitor to reach out to the contacts, without having done the work to identify the value of the leads in the first place.  (*See id*. at 125:18–21.)[16]

### b.    SLM's Apple Rep Map and Customer Lists

### i.    SLM's "Apple Rep Map"

During her time at SLM, Currie, along with her colleagues, developed a "Map of Apple Rep Territories."  (Pl.'s Hr'g Ex. 320 [116] at 2 ("Apple Rep Map").)  The Apple Rep Map identifies a wide range of Apple employees across the country serving in sales or sales-adjacent roles in the education sectors.  (*Id*. at 1.)  Although, from her previous employment with Apple, Currie already had some of the information displayed in the map, she testified that SLM paid its employees (including Currie herself) to "expand" on that information by creating and later updating the map.  (Currie Direct 84:16–85:5, 87:7–14.)

As Currie's testimony has illuminated, relationships with Apple "reps" can yield considerable value in the buyback industry.  For example, an Apple rep might feed information to a confidante involved in buyback about a competitor's "quote" to a school district, including "how much the competitors were paying, how far off [the confidante's company was], if the competitor was offering a down payment, [or] if they were waiving any fees."  (Currie Cross at 80:22–

---

[16]    Tellingly, when Currie was asked at the evidentiary hearing why she had taken the "hot leads" list, she said she had "no idea," and could not offer "any explanation."  (Currie Direct 125:22–126:9).

22

81:10.)[17]  An Apple rep might also provide a tip concerning an potential opportunity: this was how Currie learned about a valuable contract available from E.T.P. School District, a topic of much discussion in her testimony.[18]  (*See* Currie Direct at 46:22–47:15, 49:13–24 (explaining the value of the E.T.P. opportunity); Currie Cross 27:16 – 28:4 (stating that Currie became aware of the E.T.P. opportunity because "the Apple rep told [her] about it").)  It is not surprising, then, that Currie shared the Apple Rep Map with her new colleagues at Diamond Assets because she "thought it would be helpful for them in their work."  (Currie Direct 87:7–11.)  Even a competitor whose connections and experience with Apple were more limited than Currie's could effectively use the map as a launching point for valuable relationships with Apple reps, targeting reps in particular states based on the competitor's specific objectives.

At other points in her testimony, Currie attempted to downplay the importance of SLM's Apple Rep Map, disparaging it as "outdated" and noting that Diamond Assets already had its "own map" of Apple reps.  (Currie Direct 87:7:11; Currie Cross 40:12–20.)  But the SLM Apple Rep map could have considerable value even if some of the information listed was no longer accurate.  Notably, Currie did not offer any specific examples of how or why the map was outdated and has not introduced any other evidence to that effect.  And even if Diamond Assets happens to have a similar map (there is no hard evidence of this), Currie certainly has not shown that as a general matter, such a map can be readily duplicated by competitors.

---

[17]  As Currie points out, the pricing information contained in any one quote is not necessarily a trade secret, particularly if the firm in question does not impose confidentiality obligations on its customers with respect to the contents of the quotes.  (Currie Opp'n at 45) (collecting cases).  But a rolodex of Apple reps, each of which might provide insight as to quotes from *many* competitors, is a different story.

[18]  Currie later testified that the E.T. opportunity had been published in a publicly available request for proposal ("RFP").  (Currie Cross 28:7–11).  But the fact that Currie only learned about the E.T. opportunity through an Apple rep, and that Diamond Assets was not otherwise aware of the opportunity despite its ostensibly public status (Currie Direct 92:8–16), suggests that Apple reps' communications render competitive value to information that might otherwise not merit trade secret protection.

### ii. SLM's Customer Lists

Finally, much of the information that Currie took from SLM amounts to compiled records of buyback contracts that SLM won from 2020 to 2023. Some of these lists include more information than others. For instance, three spreadsheets titled "2020 Clients," "2021 Clients," and "2022 Clients," all contained in the Excel file the parties refer to as "Paula's Rock,"[19] essentially only list the names and locations of the clients for whom SLM fulfilled orders in each of the three years. (*See* Pl.'s Hr'g Ex. 386 [123].) By contrast, the spreadsheet that Currie renamed "Nick's Graduation 2" contains a more detailed record of every deal closed by SLM in 2023: for each deal, it lists the SLM employee in charge of the account, the method of determining buyback pricing for the deal, the number of devices bought back, the total buyback price ("order amount"), the address of the client, and additional notes regarding the deal, sometimes revealing whether the client was a repeat or new customer, or what kind of Apple devices were included in the order. (Pl.'s Hr'g Ex. 381 [122].) Another spreadsheet, titled "MRBS Closed-Won Deals" and contained within the Southwest Territory Excel file[20], features a somewhat-less-detailed accounting of the deals closed by SLM in its east coast states; but it too lists the name and state for the client, the number of devices bought back from the client, and whether that client was relatively new (two deals or less) or not. (Pl.'s Hr'g Ex. 380.)

As Currie correctly points out, customer lists are not always sufficiently secret to derive competitive value. Courts considering the competitive value of customer lists are particularly attuned to the "developmental costs"—the "time, energy, and effort"—required to create such lists. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 728 & n.8 (7th Cir. 2003)

---

[19] The term "rock" is used within SLM to refer to quarterly goals or quotas for procurement. (*See* Currie Direct 76:14–21.)

[20] The acronym "MRBS" stands for Mark Rand and Ben Smith, two SLM procurement employees, although the spreadsheet tab in question is actually mislabeled, as the deals described were not closed by Rand or Smith in SLM's Southwest territory, but rather under Finnegan-Ratliff in the east coast territory. (*See* Finnegan-Ratliff Direct 93:14–94:5; Currie Direct 69:12–18.)

(collecting Illinois cases). So, as Currie's cited cases suggest, a list that simply identifies a business's customers is less likely to qualify as a trade secret where "those customer identities are readily available in a public directory," and the business "provides a service commonly utilized by a particular class of potential customers." *Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *4 (N.D. Ill. Dec. 15, 2014); *see also Carbonic Fire Extinguishers, Inc. v. Heath*, 190 Ill.App.3d 948, 510, 547 N.E.2d 675, 677 (2d Dist. 1989) (customer list unprotected where customer names, addresses, and phone numbers were "readily obtainable from the yellow pages," and plaintiff operated a restaurant-hood cleaning business, a service commonly utilized by restaurants).

In this case, however, even the simplest of SLM's customer lists (those identifying SLM's clients from 2020, 2021, and 2022), are likely deserving of trade secret protection. This is true even assuming that the name and location of every SLM client can be found in the "MDR," a database available for purchase by competitors that lists all "14,000 schools, K through 12, in the United States," as Currie claims. (Currie Direct 79:13–19.) As Finnegan-Ratliff testified, in order to reach a school official who is able and willing to speak to a device buyback company representative, a SLM procurement representative might spend a lot of time cold-calling and emailing various employees within that school or district. *See* Finnegan-Ratliff Direct 8:10–10:2). And after all that effort, it might turn out that the school or district in question uses non-Apple devices (Google, for example). (Spears Hr'g Cross Test. 6:13–18 ("anywhere from eight to 15 percent" of public school districts use Apple devices); *see* Finnegan-Ratliff Direct 11:3–8.)) In other words, there may be significant developmental costs associated with confirming that a given school district is within SLM's particular class of potential customers. Indeed, Finnegan-Ratliff seemed to think that the only way (or at least the fastest way) for a competitor to duplicate SLM's client list would involve issuing a Freedom of Information Act request to every public school district in the country—and even this cumbersome process wouldn't cover SLM's private school customers. (Finnegan-Ratliff Direct 109:10–110:6.)

The documents titled "Nick's Graduation 2" and "MRBS Closed-Won Deals," describing contracts won by SLM in 2023, are even more valuable than the basic client lists from 2020 through 2022. These spreadsheets include useful data points about whether those clients were new or repeat customers, an indicator of the strength of SLM's relationship with that customer. As Finnegan-Ratliff explained in her testimony, a strong relationship with a customer often translates to less, or no, competition in bidding for buyback contracts, which in turn translates to lower buyback pricing. (Finnegan-Ratliff Direct 40:2–13, 42:8–43:21.) As such, a competitor with this information might be particularly interested in sniffing around SLM's longtime clients to undercut SLM on buyback pricing.

## II. Inadequate Remedy at Law and Irreparable Harm

To obtain a preliminary injunction, even with a likelihood of success on the merits, SLM must show "that it has no adequate remedy at law and, as a result, that it will suffer irreparable harm if the injunction is not issued." *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (citing *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir.1984)). SLM contends, and Currie concedes, that SLM is entitled to a "rebuttable presumption of irreparable harm" because this case involves the alleged misappropriation of trade secrets. (Pl.'s Mem. at 28 (quoting *Optionmonster Holdings, Inc. v. Tavant Techs., Inc.*, No. 10 C 2792, 2010 WL 2639809, at *3 (N.D. Ill. June 29, 2021); *see also* Currie Opp'n at 13.) The concession aside, it appears the presumption may no longer be available under the law in this circuit. *Life Spine, Inc. v. Aegis Spine, Inc,* 8 F.4th 531, 545 (7th Cir. 2021). The mere disclosure and use of confidential information, without more, does not amount to an irreparable harm. *See DM Trans*, 38 F.4th at 620-21. SLM must provide evidence that it "cannot be made whole by a damages award at the conclusion of trial." *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 599 (7th Cir.1984).

SLM argues that it has done so here. It urges that "[w]ithout an injunction, SLM stands to have the considerable time, expense, and resources it invested to develop [its trade secrets] undone by Defendants, thereby losing its ability to compete." (Pl.'s Mem. at 28–29.) The

monetary loss of this competitive advantage, according to SLM, in the highly competitive industry of Apple device buybacks, "would be almost impossible to calculate." (*Id*. at 29.) Defendant Currie counters that any presumption of harm would be rebutted because the harm alleged by SLM in this case is readily identifiable, as "[e]ach opportunity will definitively identify whether SLM bid, whether Diamond bid, and whether Diamond's bid prevailed over SLM's bid" and therefore "the population of potential lost transactions is easily identified." (Currie Opp'n at 14.) Currie further argues that because "prices in [the education buyback] industry change rapidly," the alleged confidential information in her possession will "lose any competitive advantage rapidly." (*Id*.)

"[C]ompetitive position in an industry defies calculation." *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965 at *30 (N.D. Ill. Jan. 2, 1996). As the Seventh Circuit has put it, "[c]ompetition changes probabilities." *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005). Even where a breach or misappropriation results allows a competitor to "improve by 5% or 10% the chance of receiving particular business . . . [o]ver many years . . . [plaintiff] will not be able to identify which contracts slipped from its grasp." *Id*. at 632–33. Therefore, "[i]rreparable harm occurs in the context of trade secret misappropriation where the trade secret misappropriation results in the intangible loss of competitive advantage." *Optionmonster Holdings, Inc. v. Tavant Techs., Inc.*, No. 10 C 2792, 2010 WL 2639809 at *9 (N.D. Ill. June 29, 2010) (citing *Jano Justice Sys., Inc. v. Burton*, 636 F.Supp.2d 763 (C.D.Ill.2009)). As the court understands SLM's business, its competitive advantage in the buyback industry consists of its accumulation of information regarding customer preferences (Spears Direct at 16:22–17:6), the identities of key decision makers for each school or school district (*id*. at 12:17–13:10), and the concentration of opportunities in various regional territories (*id*. at 30:13–31:6). This information allows SLM to concentrate its human capital in the relevant areas and cultivate Tier 1 client with a stronger profit margin than the typical, open-bid client. (*See id*. at 31:20–32:7, Pauga Direct. at 55:10–20.) With access to this information, a direct competitor like Diamond Assets

could easily redirect its resources away from low-margin open bids and towards SLM's Tier 1 clients, where Diamond Assets would know there is little competition and can afford to offer the customer a premium purchase price. (*See* Spears Direct at 31:16–32:7.) Indeed, even if Diamond Assets does not actually take the client's business, its entrance in the market of Tier 1 districts can drive up the purchase price SLM must meet in order to retain the client. (*See* Pauga Direct at 74:10–15 ("You see this information, you can go target these people. And now we are paying more for all of the deals that are our Tier 1 clients.") As Currie admits, any effort that SLM has taken to gain an advantage by identifying promising procurement opportunities is wholly undermined when a document identifying these leads is disclosed to its direct competitor. (*See* Currie Direct at 125:16–21.)

Currie's remaining arguments against a finding of irreparable harm fare no better. First, she contends that the harm is identifiable because SLM can identify specific bidding opportunities it loses—but this misstates the nature of SLM's evidence. SLM may well be able to quantify the value of a specific lost contract or deal, but it cannot so easily quantify the loss of a general competitive advantage across all its deals and procurement efforts. *See PepsiCo*, 1996 WL 3965 at *30 ("[The court] would have no way of calculating a reasonably precise level of pecuniary damage to PepsiCo for its loss of potential competitive position sustained by the disclosure of its trade secrets and confidential information.") Moreover, should SLM lose a Tier 1 client as a result of the disclosures,[21] compensation for the lost contract would not remedy the loss of future business with what SLM had believed to be a repeat customer. Contrary to Currie's assertion in her opposition brief, the Apple buyback industry does not appear to consist of "single transactions that never recur." (*See* Currie Opp'n at 14.)

As for Currie's second argument, that the harmful effect of possessing SLM's trade secrets

---

[21]     SLM suggested in the hearing that Currie, working for Diamond Assets, has already targeted one of their Tier 1 clients (*see* Spears Direct at 43:9-24), though SLM did not ultimately provide as much detail as the court requested in the hearing (*see id*. 44:11-20).

decreases over time, that is a question of the degree of irreparable harm, not whether such harm exists in the first place. The record shows that Currie took documents that reflected SLM's strategic forecasts for 2024 (*see* Pl's Hr'g Ex. 380) and deals from as recent as 2023 (*see* Pl's Hr'g Ex. 381). The court finds no reason to discount SLM's testimony that this information, as of 2024, has not yet gone stale. (*See* Spears Direct at 37:19–38:7, Pauga Direct. at 74:16–75:3.)

Finally, in her post-hearing closing brief, Currie raises new arguments that SLM has failed to factually demonstrate irreparable harm because it has not identified "an instance in which alleged disclosure or use of its information has made a difference in any market transaction," evidence that Defendants have access to SLM protected information, or evidence that Currie continues to access SLM information. (Currie Post Hr'g Br. at 7-8.)[22] Many of these arguments have already been addressed in the court's discussion of SLM's likely success on the merits. As discussed above, regardless of whether SLM can show that the disclosure of its confidential information had a measurable effect on a specific contract or bid, the court has determined that the documents were developed to give SLM a competitive advantage across the education buyback market. *See, e.g.*, *supra* p. 20–21. SLM need not articulate this harm in the results of specific contracts or bids. *See Owens*, 415 F.3d at 632 ("[A] legal rule that irreparable injury can be established *only* by a concrete demonstration . . . would make injunctions useless as a practical matter.") Indeed, if the harm caused by Currie's alleged misappropriation could be determined by whether SLM won or lost a specific set of contracts—the harm would be identifiable and, therefore, not irreparable. (*See* Currie Opp'n at 14.) As for Currie's assertion that SLM has

---

[22] In her brief, Currie provides a fourth argument that SLM has not shown irreparable harm because "Currie has explained why she downloaded so much material" and "it was not unreasonable to have concerns about potential liability." (Currie Post Hr'g Br. at 8.) Presumably the argument goes that because Currie has provided compelling justifications for taking the confidential information, there is a lesser likelihood that she will cause SLM irreparable harm. The court is not satisfied by Currie's claim that she needs the materials she took to somehow defend herself, but need not reach the argument; as explained here, SLM will likely prove that Currie actually has misappropriated or inevitably will misappropriate the confidential information. *See supra* p. 12-14.

failed to provide evidence of her continued use or access to the confidential documents, the court disagrees. Plaintiff, at more than one occasion during the hearing, showed evidence that Currie had accessed documents after she alleged to relinquish access to them. (*See* Currie Direct. at 65:7–66:15; 140:21–141:22.) Moreover, Plaintiff has provided no convincing explanation for how the act of handing the files to her attorney, without more, is any guarantee that she could not make copies of the files, or have the documents returned to her.

### III. Balancing the Equities

Because SLM has satisfied the threshold requirements of showing a likelihood of success on the merits, the inadequacy of legal remedies, and irreparable harm, the court now turns to the "balancing phase." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (quotations omitted). The court must weigh the harm to Plaintiff absent an injunction against the harm to Defendant if it is granted. *See Finch*, 82 F.4th at 578. Under the Seventh Circuit's "sliding scale" approach, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). In granting an injunction, the court also considers the public interest, "meaning the consequences of granting or denying the injunction to non-parties." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992). As a starting point in this analysis, the court notes that Currie has already agreed to a number of the requested injunctive provisions.[23] The balancing question for the court is whether SLM's likelihood of success on the merits, irreparable harm beyond what is mitigated by

---

[23]     Including (to paraphrase): restraining Currie from violating her non-disclosure agreement (1(b)); restraining Currie from utilizing divulging, disclosing, or misusing Plaintiff's secret or confidential information as described in the non-disclosure agreement (1(d)); requiring Currie to submit her personal devices for forensic imaging and examination (2(a)); requiring return and subsequent deletion of Plaintiff's information from Currie's personal devices (2(b)); requiring immediate return of all hard copies of Plaintiff's trade secret or confidential information (2(c)); and requiring the preservation of all document and information relevant to Plaintiff's factual allegations (2(d)). *See* Pl.'s Mem. at 8-9.)

the agreed upon provisions, and the public interest justify a broader injunction including provisions 1(a) (restricting Currie from performing procurement services for Diamond Assets) and 1(c) (restricting Currie from reaching out to SLM's customers, prospective customers, and referral sources).

### A. "Sliding Scale"

As discussed above, SLM has a strong likelihood of success on the merits. There is little doubt that at least some of the documents taken by Defendants in their exit from SLM were trade secrets and confidential under the terms of Currie's non-disclosure agreement. *See supra* p. 11. Currie has admitted at the preliminary injunction hearing that she "share[d] SLM confidential information with Diamond Assets' chief executive officer to try to give them an unfair competitive advantage." (*See* Currie Hr'g Direct Test. at 142:13-17.) SLM has a strong chance of recovery on at least one of its claims.

In determining the degree of irreparable harm facing SLM, it is notable that Currie has agreed to an injunction requiring her to return all confidential information, to not use or disclose any further trade secrets or confidential information, and to submit her personal devices for forensic analysis. *See supra* p. 11 n. 5. These agreed provisions directly address SLM's concerns that Currie may, going forward, continue to disclose confidential information to give Diamond Assets a competitive edge. Furthermore, although the passage of time does not eliminate its value, the court recognizes that the information in Currie's possession does become "increasingly stale and less valuable" as "market conditions" change. *See Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 903 (N.D. Ill. 2019).

Any mitigating effect, however, of the agreement to certain relief must be weighed against Currie's credibility. Currie's agreement not to use trade secrets or to return all physical copies of SLM's confidential information militates against the award of broader relief only if the court has confidence that Currie does not in fact have possession of the documents or an intention to use them. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) (affirming broad

31

preliminary injunction restricting defendant from working on product integration relevant to trade secret claim where "[defendant] could not be trusted to avoid that conflict of interest"). Currie's testimony at the preliminary injunction hearing raised significant questions about her credibility. On two occasions, Currie's testimony that she did not have access to specific confidential documents was directly contradicted by metadata showing she had edited the documents days after providing them to her lawyer, in one case just an hour before a "strategy" meeting with Diamond Assets executive. (*See* Currie Direct at 140:18–141:22.) On several occasions, Currie's testimony at the hearing contradicted or deviated from her prior testimony at her deposition. (*See, e.g.*, *id*. at 132:21-133:9, 119:23-120:16, 122:3-21.) Inconsistencies in Currie's explanation of the events in question raised further concerns. Questioned by her attorney, Currie testified that she "took documents that [she] thought [she] needed and were necessary to protect [herself]" from legal liability stemming from SLM's alleged failure to pay customers (*see* Currie Cross at 68:12-69:17)—but had no explanation, when questioned by SLM's counsel, why she took a document listing SLM's "hot leads" for prospective clients that presumably had no connection to her "concerns" about liability. (*See* Currie Direct at 125:16-23.) Indeed, Currie provides no thorough explanation for how any of the documents would be crucial for a criminal defense, in contrast to their obvious competitive value. Regarding the laptop she returned to SLM with significant water damage, Currie maintained that she had dropped the laptop in the bath (*id*. at 120:22-121:4)—but provides no reason for why she did not immediately alert SLM concerning the damage to a laptop that belonged to SLM and was one of her primary work devices (*see id*. at 121:9-18, 120:7-11). Given these contradictions and inconsistencies within Currie's testimony before this court, an agreement to return and destroy documents in her possession, withhold from using SLM's confidential information, and submit devices to forensic evaluation does not extinguish the risk of irreparable harm to Plaintiff.

The court acknowledges that the harm to Currie in the event of a full grant of SLM's broad injunction, beyond the terms she has agreed to, is significant. Restricting her from any

procurement activities for Diamond Assets pending litigation, as Senior Vice President of Procurement, would effectively require Currie to resign or at least furlough from her current position. (*See* Currie Opp'n at 15.) Currie does not explain, however, whether such an injunction would prevent her from performing all of her current responsibilities for Diamond Assets. An injunction restricting her from performing a specific kind of work for a specific employer "does not prevent [her] from earning a living." *See Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (affirming injunction restricting defendant from soliciting "commercial roofing" business from any of plaintiff's customers in a specific geographic area). As SLM points out, Currie would not be restricted from returning to the Apple sales business, where she worked prior to SLM. (*See* Pl.'s Mem. at 29-30.) Moreover, while the harm to Currie in the event of an injunction may be significant, it does not appear to be irreparable. *See Turnell*, 796 F.3d at 666 ("The kind of harm we are concerned about when deciding whether to issue a preliminary injunction is not harm *tout court* but rather *irreparable* harm.") (italics in original). Should Currie lose her employment or be otherwise harmed by a restriction on her ability to work, it should be possible to quantify these losses and compensate her if she prevails on the merits. *See id.* All of that said, the court is mindful that, though injunctive relief is warranted, it is not bound to impose the broadest restrictions requested by SLM. *See PepsiCo*, 54 F.3d at 1272 ("A district court ordinarily has wide latitude in fashioning injunctive relief.")

###    B.    Public Interest Factors

It is well established that injunctions protecting the disclosure of trade secrets serve important policies of "fair competition, business innovation, and economic efficiency." *See generally PepsiCo*, 1996 WL 3965 at *31-32; *see also Televation Telecomm. Sys., Inc. v. Saindon*, 522 N.E.2d 1359, 1362, 169 Ill.App.3d 8, 12 (2nd Dist. 1988) ("the court should protect the employer's investment of time, money and manpower in developing secret advantages from misappropriation by former employees who occupied a position of trust.") These policy considerations are particularly salient in this case, where SLM has demonstrated that the

confidential documents at issue were the result of significant effort and investment.

At the same time, the court must balance these concerns against "the employee's right to make use of general knowledge and skills acquired through experience in pursuing the occupation for which he is best suited." *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, 734 (N.D. Ill. 2011) (citing *Serv. Centers of Chicago, Inc. v. Minogue*, 535 N.E.2d 1132, 1135, 180 Ill.App.3d 447, 452 (1st Dist. 1989)). As Currie notes, the parties here never negotiated a non-compete agreement (Currie Post Hr'g Br. at 9), and the court must be careful not to unduly restrict Currie's ability to work for an employer of her choosing using her talents and knowledge unrelated to SLM's confidential information.

In terms of the interests of "innocent third parties," *see Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1146 (N.D. Ill. 2019), the most interested third party in this case is Currie's current employer, Diamond Assets. Diamond Assets is not a party to this case, but an injunction that enjoins Currie from "[p]erforming any procurement related services for Diamond Assets, including, without limitation, in a managerial role," would presumably disadvantage Diamond Assets, which is paying for Currie's expertise. This consideration has little weight here, however, as there is no evidence that Diamond Assets has invested substantial resources into its contract with Currie that would be compromised by an injunction restricting the scope of her work. *Cf. id.* (denying preliminary injunction restricting defendant from working with third parties "given those entities appear to have now invested substantial amounts of their own resources into advancing their contracts with [defendant]). More importantly, If SLM is successful on its claims that Currie took confidential information to give Diamond Assets an advantage, Diamond Assets may not be "innocent"—it would directly benefit from Currie's use and disclosure of SLM's confidential information. (*See* Finnegan-Ratliff Direct at 65:20–67:5 (explaining that Diamond Assets won bid against SLM after Defendants sent SLM's bid information to Diamond Assets' CEO).) Indeed, SLM has offered evidence that Diamond Assets explicitly solicited information regarding SLM's past deals from Currie. (*See* Currie Direct at 27:16–28:17.) Regardless of whether this makes

Diamond Assets *legally* culpable---it is not a defendant in this case---Diamond Assets was close enough in proximity to the alleged wrongdoing here that its interest in avoiding an injunction cannot be said to be a "public interest."

### C.    Balancing the Equities

Taking SLM's high likelihood of success on the merits, the irreparable harm facing SLM, Currie's lack of credibility in this proceedings, and strong policy consideration favoring protections for commercial trade secrets, the court concludes that the balance of equities favors a preliminary injunction beyond the terms agreed upon by the parties.  That said, in light of the potential harm that a complete and indefinite bar on performing procurement services may cause to Currie, and her uncontroverted testimony that the importance of SLM's confidential documents will decrease over time, SLM's proposed injunction under provisions 1(a) and 1(c) goes too far.  Instead, the court finds the Seventh Circuit's decision in *Turnell v. Centimark Corp.* helpful in fashioning an injunction to these circumstances.   In *Turnell*, the plaintiff roofing company sued a former employee for violating his non-disclosure and non-solicitation agreements by working for a competitor after being fired.  *See* 796 F.3d at 660-61.  The plaintiff sought a preliminary injunction enforcing the covenants, which would have banned defendant from selling any product or service "similar" to plaintiff's to the plaintiff's own actual or prospective customers, without geographical limitation.  *Id*. at 661.  The district court found those restrictive covenants "too broad" and instead fashioned an injunction that enforced the covenants only to the extent "reasonably necessary for the protection" of the plaintiff.   Specifically, the injunction barred defendant from "sell[ing], attempt[ing] to sell, or help[ing] sell any product or services," specifically related to commercial roofing, only to plaintiff's actual customers at the time of defendant's termination (not prospective or former customers) and limited to a specific geographic area of seven states where defendant had worked most extensively while employed by plaintiff.  *Id*.  Affirming that determination, the Seventh Circuit concluded that the injunction, while harmful, was not "crippling" to defendant, as he was still "able to work," could sell commercial roofing for the competitor to different customers

and could sell other types of roofing "without restriction." *See id*. at 666. ("In short, the injunction does not prevent him from earning a living.") There was no evidence that the injunction would "consign him to poverty or bankrupt him." *Id*. Defendant's monetary harms from the injunction, while likely greater than the harm to plaintiff absent an injunction, did not rise to "irreparable," and did not overcome plaintiff's strong showing of likelihood of success on the merits. *Id*. at 666-67.

Using *Turnell*'s logic here, while provisions 1(a) and 1(c) may be too broad, the court can limit their scope to the extent "reasonably necessary for the protection" of SLM's confidential information. *See id*. at 661. As such, the court will **grant** SLM's motion with respect to the agreed upon provisions (1(b), 1(d), 2(a)-(d)), and will **deny** SLM's motion with respect to 1(a) and 1(c). Instead, the court will restrain and enjoin Defendant Currie from contacting, soliciting, or otherwise participating in the procurement of Apple device buyback services, any of SLM's existing customers as of February 9, 2024, for a period of one year from the issuance of this order or until an earlier decision on the merits. Currie is not restricted from the procurement of buyback services unrelated to Apple devices, from procuring new customers not currently already contracting with SLM, or from participating in broader strategic decisions regarding Diamond Assets procurement services. Currie will thus be screened from working on procurement matters related to SLM's most important opportunities, their existing Tier 1 clients (*see* Spears Direct at 30:21–31:25, Pauga Direct at 74:10–15), but will not be restricting from performing job responsibilities unrelated to the confidential information at issue here. Plaintiff is ordered **within 21 days** to provide the court with an account of its existing customers as of February 9, 2024. Defendant Currie is ordered **within 14 days** thereafter to respond, contesting the accuracy of Plaintiff's proffered list if appropriate and presenting proposed screening procedures that will ensure she does not work on these matters properly listed by Plaintiff.

As for SLM's referral sources, which SLM seeks to include in the injunction (*see* Pl.'s Mot. at 6), the court notes that Currie has taken confidential information that would be useful to Diamond Assets in targeting specific Apple representatives (*see* Apple Rep Map, *supra* p. 17-18),

but also recognizes that some referral sources may be relationships that Currie developed as an Apple sales representative (*see* Currie Cross at 84:16–25 (explaining that information in the Apple Rep Map was brought up from her work with Apple).). Because these relationships were not formed by virtue of Currie's employment at SLM, the court will not restrict Currie from doing business with these contacts. The court orders that **within 21 days**, the parties confer and provide a list of referral sources with whom Currie had an existing relationship prior to joining SLM in 2019, or otherwise where such a pre-existing relationship is in dispute.

## CONCLUSION

Plaintiff's motion for a preliminary injunction is granted in part. Plaintiff is directed to provide a list of existing customers within 21 days as described above, to which Defendant Currie will respond, for the court's review. The parties are also directed within 21 days to provide a list of referral sources known to Currie prior to her employment with SLM.

Defendant Currie is restricted and enjoined

a) from contacting, soliciting, or otherwise participating in the procurement of Apple device buyback services, any of SLM's existing customers as of February 9, 2024, or existing referral sources not excluded by agreement of the parties, for a period of 1 year from the issuance of this order or until an earlier decision on the merits.

b) Violating or participating in the violation of any of the terms of the Currie NDA, and

c) Utilizing, divulging, disclosing, or misusing any of SLM's trade secret and/or confidential information as defined the Currie, provided that the injunction will not prevent Defendants from communicating with any government authorities

Defendant Currie is further required to:

d) Submit for forensic imaging and examination of all the Defendants' personal devices and personal accounts ("devices/accounts") used at any time during the time period of January 1, 2022, through the present, by the forensic imaging vendor. Such images shall be stored by such vendor pursuant to an escrow agreement that does not permit anyone to access the same without (i) a court order, or (ii) the written agreement of the Parties;

e) Submit for forensic imaging and examination, the same devices/accounts, to a vendor agreed upon by the parties pursuant to a forensic examination agreement, and the return of all SLM's information accessible on/in the same by the vendor to SLM before deleting from such devices/accounts pursuant to the agreement;

f) Immediately return all hard copies of any trade secret and/or confidential information or other confidential or trade secret information (as defined in the Currie NDA) in Defendants' possession, custody, or control; and

g) Preserve all documents, electronically stored information, and other information relevant to the factual allegations and claims contained within the Complaint, including any communications, text messages, or emails on personal electronic devices, such as cellular telephones, or stored in email or other cloud storage accounts, by and between the Defendants; between Diamond Assets and Defendants; between the Defendants and any Diamond Assets employee; and between the Defendants and any of SLM's customers, prospective customers, or referral sources.

ENTER:

Dated:  October 18, 2024

_____
REBECCA R. PALLMEYER
United States District Judge