**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MY FAV ELECTRONICS, INC. d/b/a** ) | |
| **SECOND LIFE MAC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 24 C 1959** |
| **v.** ) | |
| ) | **Judge Rebecca R. Pallmeyer** |
| **PAULA B. CURRIE, DIAMOND ASSETS** ) | |
| **LLC, and DIAMOND MCKENNA,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Second Life Mac ("SLM") and Defendant Diamond Assets, LLC ("Diamond Assets") are both in the business of purchasing used Apple devices, mostly from school districts, and reselling those devices. SLM alleges that Diamond Assets and its CEO, Diamond McKenna (collectively, the "DA Defendants") induced two of SLM's former employees, Paula Currie and Megan Finnegan-Ratliff, to transmit SLM's confidential information and trade secrets to Diamond Assets and leave their jobs at SLM.[1] SLM asserts that both Currie and Finnegan-Ratliff had been officers of the corporation; Currie held the title of Vice President of Procurement at SLM, and Finnegan-Ratliff served as Regional Vice President (East) of Procurement.

Following her departure from SLM, Currie went to work for Diamond Assets; Finnegan-Ratliff wished to do the same but was stymied by a non-compete provision in her employment agreement with SLM. With Currie on its roster and with SLM's trade secrets in hand, SLM alleges, Diamond Assets then proceeded to target SLM's existing buyback customers, unfairly gaining a

---

[1] Currie and Finnegan-Ratliff later filed counterclaims against SLM. (*See* Amended Counterclaim [186].) SLM and Finnegan-Ratliff have since stipulated to a consent injunction and judgment, which the court entered on February 28, 2025. (Consent Injunction and Final Judgment [285].) On May 30, 2025, Currie and SLM notified the court that they had reached a tentative settlement agreement but for now, Currie remains a Defendant in this case. (*See* Minute Entry [304].)

competitive advantage over SLM and in some cases, managing to wrest away SLM's customers.

SLM charges the DA Defendants with (1) misappropriation of trade secrets under both the Defend Trade Secrets Act, 18 U.S.C. § 1986 ("DTSA"), and Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq* ("ITSA"); (2) tortious interference with Currie and Finnegan-Ratliff's employment agreements with SLM; (3) tortious interference with SLM's business relationships with its customers; (4) aiding and abetting Currie and Finnegan-Ratliff's breaches of their fiduciary duties to SLM; and (5) unjust enrichment at SLM's expense. (Amended Compl. [201] ¶¶ 234–97.) The DA Defendants have moved to dismiss SLM's claims for lack of personal jurisdiction or, in the alternative, for improper venue [237]. That motion is now fully briefed and, for the reasons explained below, is denied.

Although the parties have not commented in depth on the merits of SLM's claims, the court notes that the ITSA is intended to displace conflicting civil remedies under Illinois common law, including claims for restitution and claims of unfair competition or other tort theories. 765 ILCS 1065/8(a). Thus, to the extent SLM's auxiliary state law claims "involve an alleged misappropriation of" SLM's trade secrets, they may be preempted by the ITSA. *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 784, 331 Ill. App. 3d 777, 796 (1st Dist. 2002). *But see Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 719–20 (N.D. Ill. 2014) (citing *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404–05 (7th Cir. 2005)) (claims involving the misuse of non-confidential information are not preempted); *Gen. Elec. Co. v. Uptake Techs., Inc.*, 394 F. Supp. 3d 815, 834 (N.D. Ill. 2019) (framing the ITSA preemption inquiry as asking whether plaintiff's claims "would stand regardless of whether trade secrets were at issue.") The court will expect the parties to address this issue in subsequent filings.

## BACKGROUND

On October 18, 2024 (before the DA parties had been named as Defendants), the court granted a preliminary injunction in favor of SLM against Currie following an evidentiary hearing. (*See* Prelim. Inj. Order [188] at 2–10.) The court begins by summarizing the findings set forth in

that order and then turns to SLM's allegations concerning the DA Defendants' conduct, as well as an affidavit submitted by McKenna in support of the DA Defendants' motion to dismiss for lack of personal jurisdiction. In addressing that motion, the court presumes the truth of SLM's well-pleaded allegations. *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019) (citation omitted). Unless contradicted by affidavits, the court presumes the truth of those allegations for purposes of the DA Defendants' venue challenge under Rule 12(b)(3) as well. *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016) (citing 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. AND PROC. § 1352 (2004)).

SLM is an Illinois corporation with its principal place of business in Skokie, Illinois. (Amended Compl. [201] at ¶ 3.) SLM is in the "Apple buyback" business: it procures used Apple devices from third parties—mostly school districts—and resells those used devices through wholesale and retail channels. (Prelim. Inj. Order at 2.) SLM does business in Illinois, among other states. (Amended Compl. at ¶ 3.) Although SLM is the purchaser of used Apple devices in these transactions, SLM refers to the entities from whom it procures the devices as its "customers," and to the purchases themselves as "sales." (Prelim. Inj. Order at 2 & n.2.)

SLM invests significant resources in identifying prospective customers and existing customer relationships. (*Id.* at 3.) Information about a customer—for example, the identities and contact information of its key decisionmakers, the buyback prices it has accepted for Apple devices in the past, and the mere fact that it is in the market to sell devices—is particularly valuable in the buyback industry because not all customers publicly solicit bids for their used devices. (*See id.* at 3–4 & n.4.) The most valuable customer is one who repeatedly gives its business to a single buyback partner, accepting lower bids for the devices than they might in an open bidding process. (*Id.* at n.4.)

Currie and former co-Defendant Finnegan-Ratliff were employees of SLM from April and March 2019, respectively, until they resigned in February 2024. (*Id.* at 5–6.) Currie and Finnegan-Ratliff both reside in Ohio and are close personal friends. (*Id.* at 5; Amended Compl. ¶¶ 4–5.)

Currie served as the Vice President of Procurement at SLM, and Finnegan-Ratliff as Regional Vice President (East) of Procurement; both roles involved managing salespeople, maintaining customer relationships, and setting procurement strategy. (Prelim. Inj. Order at 5.) Currie's responsibilities extended nationwide, while Finnegan-Ratliff's were limited to the eastern United States. (*Id.*) (*See* Amended Compl. ¶ 1.) Their roles gave both Currie and Finnegan-Ratliff access to confidential information at SLM, and each had agreed to non-disclosure provisions as part of their employment at SLM. (Prelim. Inj. Order at 5.) Finnegan-Ratliff's employment contract also included non-compete and non-solicitation provisions designed to prevent her from working with competitors or otherwise soliciting SLM's customers for a period of one year after her last day of employment with SLM. (*Id.*) The non-compete provision specifically named Diamond Assets as a restricted competitor. (*Id.* at 6.)

The relationships between SLM and Currie and Finnegan-Ratliff did not end well. On January 10, 2024, two members of SLM's leadership, Scott Pauga and Bryan Spears, told Currie that moving forward, she would no longer be in charge of procurement for SLM; Currie saw this as a demotion. (*Id.*) Within two days, Currie had contacted Diamond Assets and begun exchanging text messages with Diamond McKenna to discuss Currie's potential employment at Diamond Assets. (*Id.*; Amended Compl. ¶¶ 38–39.) By January 22, 2024, Currie had signed a letter agreeing to serve as Diamond Assets' Senior Vice President of Procurement and Education, a role with nearly identical responsibilities to those Currie had held at SLM. (Prelim. Inj. Order at 6.) Currie was slated to start work at Diamond Assets on February 5, 2024. (*Id.*) After Currie signed her offer letter at Diamond Assets, both she and Finnegan-Ratliff tendered their resignations to SLM with an effective date of February 9, 2024, thus creating an overlapping period of four days where Currie was (on paper) employed both by SLM and Diamond Assets. (*Id.*) Finnegan-Ratliff hoped to work with Currie at Diamond Assets but understood that the non-compete provision in her employment contract might prevent her from doing so. (*Id.*)

Between the time of Currie's "demotion" at SLM on January 10, 2024 and Currie and Finnegan-Ratliff's effective resignation date, February 9, 2024, the two women downloaded a trove of their former employer's information onto personal devices, including lists of SLM's customers, a record of every deal SLM had closed in 2023, a list of leads for prospective "high-value" customers, and procurement forecasts for 2024. (*Id.* at 7.) Currie also sent McKenna text messages disclosing that based on SLM's current inventory, SLM would not be aggressive in efforts to purchase a particular model of Apple device on the market. (*Id.* at 7–8.) Further, the metadata of several of the files Currie had taken from SLM reflected that she had accessed them on her iPad immediately before participating in a call with a procurement executive at Diamond Assets on February 7, 2024, and immediately before another meeting with Diamond Assets personnel on February 17, 2024. (*Id.* at 10.)

Currie and Finnegan-Ratliff did not deny taking SLM's information but contended that the information was not confidential and did not amount to trade secrets. (*Id.* at 7.) The court disagreed and found that SLM was likely to succeed on its claims that Currie and Finnegan-Ratliff had misappropriated SLM's trade secrets under both the DTSA and ITSA and had breached their contracts with their former employer. (*See id.* at 11.) By the time the court entered its ruling, Finnegan-Ratliff had already agreed to abide by SLM's proposed restrictions on her conduct moving forward; the preliminary injunction thus issued only as to Currie. (*See id.* at 1–2.) Soon after the court's grant of the preliminary injunction, SLM amended its complaint on November 6, 2024, adding Diamond Assets and McKenna as Defendants.

Diamond Assets is a Wisconsin limited liability company with its principal place of business in Milton, Wisconsin.[2] (McKenna Aff. ([28-1] ¶ 9.) McKenna, the company's CEO, also lives in

---

[2] SLM alleged in its amended complaint that Diamond Assets is a Delaware corporation (Amended Compl. ¶ 6) but does not appear to contest now that the Defendant company is a creature of Wisconsin law.

Wisconsin. (*Id.* ¶ 17.) SLM describes Diamond Assets as its "most significant competitor" in the Apple buyback industry. (Amended Compl. ¶ 1.)

Diamond Assets has no offices or facilities in Illinois, and though a handful of Diamond Assets' employees live in Illinois, these employees commute to Wisconsin for work. (McKenna Aff. ¶¶ 10–11.) Diamond Assets does, however, do business in Illinois; about five percent of its 2024 buyback customers were located in the state. (*Id.* ¶ 12.) As McKenna explains in her affidavit in support of the DA Defendants' motion, Diamond Assets also conducts about half of its annual board meetings in Illinois, while the rest take place in Wisconsin. (*Id.* ¶¶ 15–16.) SLM further asserts that Pfingsten Partners, the private equity group that is the majority owner of Diamond Assets, is based in Chicago; that at least three members of Pfingsten—Scott Finegan, Kenneth Hessevick, and Ryan Lavelle—are "engaged with and oversee" the Diamond Assets business generally speaking; and that Finegan, Hessevick, and Lavelle all played a role in hiring Currie, most notably by weighing in on (if not determining) the level of Currie's compensation at Diamond Assets.[3] (*See* Opp. [260] at 3–5.)

SLM alleges that the DA Defendants knew that Currie and Finnegan-Ratliff (1) had confidentiality agreements with SLM, and (2) were officers of SLM, but nonetheless set out to induce Currie and Finnegan-Ratliff to defect from SLM and transmit its confidential and trade secret information to Diamond Assets. (Amended Compl. ¶¶ 264–91.) The DA Defendants then allegedly used SLM's information to compete directly with SLM in the Apple buyback market in states including Illinois. (*Id.* ¶ 15.)

For example, SLM alleges that Currie and Finnegan-Ratliff disclosed to McKenna the contents of confidential buyback proposals SLM had made to three particular school districts, knowing that Diamond Assets was competing head-to-head with SLM for those contract

---

[3]    On SLM's account, these Pfingsten personnel are so involved in the operations of Diamond Assets that they are not "separate" or "distinct" from Diamond Assets at all. (Opp. at 5 n.4.)

opportunities ("School District Opportunities"). (*Id.* ¶¶ 52–53.) Diamond Assets ended up winning two of those School District Opportunities. (*Id.* ¶ 57.) SLM also avers that on February 5, 2024, while still formally employed by SLM, Currie tipped Diamond Assets off to another buyback opportunity with a school district that SLM was bidding on, and that Diamond Assets had not previously been aware of; Diamond Assets entered the bidding process just before it closed and ended up winning that contract as well, worth hundreds of thousands of dollars. (*Id.* ¶¶ 52–53.) It is not clear from the face of the complaint where the school districts referred to here are located, but McKenna asserts in her affidavit that they are in Wisconsin, New York, Minnesota, and New Jersey. (McKenna Aff. ¶¶ 44–45.) SLM does not appear to challenge that assertion but contends that by August 2024, the DA Defendants had also sought to poach at least three of SLM's existing Illinois clients—school districts that SLM refers to as S68, SS, and NDLS—using information Currie had taken from SLM and, according to SLM, Diamond Assets succeeded in wresting NDLS's business away from SLM.[4] (*See* Opp. at 1; Mbangamoh Aff. [261].)

McKenna concedes that she communicated with Currie by text and phone call between January 12 and January 26, 2024 regarding the possibility of Currie's joining Diamond Assets, and that she met Currie in person at a Starbucks in Indiana on January 16, 2024. (McKenna Aff. ¶¶ 25–28.) McKenna further concedes that she continued to exchange calls and text messages with Currie in the period spanning January 26 to February 6, 2024, and that Currie was present at Diamond Assets' Wisconsin headquarters from February 5 to 8, 2024 to attend meetings and begin her employment there. (*Id.* ¶¶ 32, 39.) Diamond Assets did not hire Finnegan-Ratliff, but McKenna acknowledges that she spoke to Finnegan-Ratliff via text message and phone in January 2024. (*Id.* ¶¶ 33, 35, 37.)

---

[4] Facts alleged in a brief in opposition to a motion to dismiss "may be considered when evaluating the sufficiency of a complaint so long as they are consistent of the allegations in the complaint." *Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015) (citations omitted). These details regarding school districts S68, SS, and NDLS are consistent with SLM's allegation that the DA Defendants used SLM's trade secrets and confidential information to gain a competitive advantage over SLM in Illinois. (*See* Amended Compl. ¶ 15.)

## DISCUSSION

I.    **Personal Jurisdiction**

SLM bears the burden of establishing the court's personal jurisdiction over Diamond Assets and McKenna.  *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019) (citation omitted).  Where, as in this case, the court makes its determination based on written submissions rather than an evidentiary hearing, a plaintiff need only make a prima facie showing of personal jurisdiction over the defendant to survive a motion to dismiss.  *Id.* (citation omitted).  In making this showing, the plaintiff "is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record."  *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citation omitted).

SLM levels both federal and state law claims against the DA Defendants.  In a case where federal question jurisdiction is invoked, the court may exercise personal jurisdiction over the defendant "if either federal law or the law of the state in which the court sits authorizes service of process to that defendant."  *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 393 (7th Cir. 2020) (citation omitted).  Illinois's long-arm statute permits the exercise of personal jurisdiction to the full extent permitted by the Fourteenth Amendment's Due Process Clause.  *Id.* (citations omitted).  The court must therefore consider whether the exercise of personal jurisdiction over the DA Defendants "comports with the limits imposed by federal due process."  *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).

In construing those limits, the Seventh Circuit has explained that specific personal jurisdiction is appropriate where (1) a defendant has purposefully directed its activities at the forum state or purposefully availed itself of the privilege of conducting business in the forum, and (2) the plaintiff's alleged injury arises out of the defendant's forum-related activities.  *Matlin*, 921 F.3d at 705–06 (citation omitted).  On the whole, the district court's exercise of personal jurisdiction must "not offend traditional notions of fair play and substantial justice."  *Rogers v. City*

8

*of Hobart, Ind.*, 996 F.3d 812, 819 (7th Cir. 2021) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

The DA Defendants, while describing their contacts with Illinois as "limited," do not appear to contest that they purposefully avail themselves of the privilege of doing business in this state. (*See* Mem. [238] at 9–10.) Nor could they: it is plain that Diamond Assets and its CEO, McKenna, reach out beyond Wisconsin and into Illinois to pursue (and win) Apple buyback opportunities with Illinois customers. The question is whether the injuries alleged by SLM in this case arise out of the contacts that Diamond Assets and McKenna have with Illinois. The court finds that they do.

A defendant's contacts with the forum may "relate to" the plaintiff's claims without a "strict causal relationship" between the contacts and the claims. *B.D. by & through Myer v. Samsung SDI Co., Ltd.*, 91 F.4th 856, 862 (7th Cir. 2024) (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 361 (2021)). Rather, what courts must ensure is that the conduct and the litigation are related. *Myer*, 91 F.4th at 862 (citing *Ford Motor Co.*, 592 U.S. at 371). Here, SLM alleges that the DA Defendants (1) induced SLM's former employees, Currie and Finnegan-Ratliff, to break their confidentiality agreements with SLM and disclose competitively valuable trade secret information to Diamond Assets; and (2) used that trade secret information to compete directly for at least three of SLM's existing Illinois customers, in one case successfully beating out SLM for the business.

The injuries SLM purportedly suffered as a result of the DA Defendants' alleged misconduct—both the lost dollar value of at least one buyback opportunity and "the intangible loss of competitive advantage" (Prelim. Inj. Order at 27 (citation omitted))—are directly related to the DA Defendants' pursuit of buyback opportunities. And at least some of those alleged injuries stem from Defendants' pursuit of buyback opportunities in Illinois, specifically. This is true even with respect to SLM's claims that the DA Defendants tortiously interfered with Currie and Finnegan-Ratliff's employment contracts and aided and abetted their breach of their fiduciary duties to SLM. By and large, the communications underlying those claims appear to have been

electronically transmitted between Wisconsin (where Diamond Assets and McKenna are based) and Ohio (where Currie and Finnegan-Ratliff reside)—but the *harm* that SLM claims to have suffered as a result of that misconduct still arises from Diamond Assets' resultant use of the trade secrets in Illinois (among other places).

The DA Defendants argue that the affidavit and emails SLM has offered in support of its assertions that Defendants targeted three of SLM's Illinois school district customers—S68, SS, and NDLS—are inadmissible as hearsay or because they lack adequate foundation. (*See* Reply [276] at 2–7.) As the DA Defendants point out, where a defendant submits evidence in opposition to the court's exercise of personal jurisdiction, the plaintiff must likewise submit evidence in support. (Reply at 2 (citing *Purdue Rsch. Found.*, 338 F.3d at 782–83 & n.13.) That SLM's submissions may not meet evidentiary standards is less significant here, however, because the evidence offered by the DA Defendants does not rebut the allegation that they targeted SLM's Illinois customers. Instead, McKenna asserts that the specific buyback opportunities mentioned in SLM's complaint concerned school districts that were not in Illinois. In any event, had McKenna specifically denied pursuing S68, SS, and NDLS, the court would be required to resolve the factual dispute in SLM's favor, s*ee Matlin*, 921 F.3d at 705, or at minimum, allow for jurisdictional discovery. *See Myer*, 91 F.4th at 864 (jurisdictional discovery appropriate where plaintiff makes a colorable showing that personal jurisdiction exists; court must draw all inferences in plaintiff's favor in deciding whether to allow jurisdictional discovery).

The DA Defendants' leading case on this issue, *J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*, 965 F.3d 571 (7th Cir. 2020), is inapposite. (*See* Mem. at 10–13; Reply at 8.) In *J.S.T.*, the plaintiff, an Illinois company, alleged a former business partner had wrongfully acquired plaintiff's proprietary designs for certain electronic equipment and then provided those designs to the plaintiff's competitors, allowing the competitors to build knockoffs. *Id.* at 573. The plaintiff sued one of those competitors, Foxconn, in this District for trade secret misappropriation—but Foxconn's "only link" to Illinois was that they sold the knockoff equipment to plaintiff's former

10

business partner, knowing that the equipment would be incorporated in parts sold to General Motors, and that General Motors cars containing those parts would eventually be sold in Illinois. *Id.* at 573–74. The Seventh Circuit affirmed the district court's dismissal for lack of personal jurisdiction, rejecting the application of this "stream of commerce" theory of personal jurisdiction in the trade secrets context. *Id.* at 575–76. As the panel explained, "[b]ecause the defendants themselves did not acquire, disclose, or use J.S.T.'s trade secrets in Illinois, the link between the Illinois sales and their misappropriation of J.S.T.'s trade secrets is attenuated." *Id.* at 577. Here, SLM does not rely on the stream of commerce theory: it alleges that the DA Defendants themselves reached directly into Illinois and competed with SLM for customers in this state using SLM's misappropriated trade secrets. That link to the forum is precisely what was missing in *J.S.T.*

The Defendants' other proffered case on this topic, *AbbVie Inc. v. Alvotech HF*, No. 21 C 1530, 2021 WL 4593490 (N.D. Ill. Oct. 6, 2021), is unpersuasive for similar reasons. (*See* Mem. at 10–11.) There, the plaintiffs, pharmaceutical companies headquartered in Illinois, alleged that defendant Alvotech, incorporated and headquartered in Iceland, had misappropriated trade secrets from the plaintiffs' Singapore facility and used those trade secrets to develop a copycat pharmaceutical product in Iceland. *Id.* at *1. The plaintiffs argued that the court had personal jurisdiction over Alvotech because the trade secrets defendant had misappropriated were "developed under the supervision of AbbVie's Illinois management," and defendant intended to sell the copycat product in Illinois through its U.S. affiliate. *Id.* The *Alvotech* court was unpersuaded, reasoning that Alvotech's alleged misconduct in Singapore and Iceland was "far too attenuated" from the forum to create specific personal jurisdiction. *Id.* at *3. The court noted, further, that Alvotech's U.S. affiliate was a separate domestic corporation and had not actually sold the alleged copycat product anywhere yet. *Id.* at *2. Citing *J.S.T.*, the court concluded it had no personal jurisdiction over the Icelandic defendant corporation merely because defendant knew

the alleged trade secrets would be used to make a product that would eventually be sold in Illinois. *Id.*

The links to the forum here are far less attenuated than those at issue in *Alvotech* and *J.S.T.*, and the court is comfortable that it has specific personal jurisdiction over the DA Defendants with respect to all of SLM's claims. It now considers whether venue is proper in this District.

## II. Venue

The federal general venue statute, 28 U.S.C. § 1391, provides that venue in a civil case is proper in

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

*KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013). The plaintiff bears the burden of establishing proper venue when challenged by a defendant. *Allstate Life Ins. Co. v. Stanley W. Burns, Inc.*, 80 F. Supp. 3d 870, 875 (N.D. Ill. 2015). "District courts have a substantial amount of discretion in determining venue, which is an inquiry focused on fairness and convenience of the parties as opposed to constitutional considerations." *Dutch Valley Growers, Inc. v. Rietveld*, 314 F.R.D. 293, 295 (N.D. Ill. 2016) (quoting *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866–67 (N.D. Ill. 2009)).

Venue is proper in this District because a substantial part of the events underlying this case took place here. That Plaintiff resides in this District or felt economic harm here is not, by itself, enough. *Ford-Reyes v. Progressive Funeral Home*, 418 F. Supp. 3d 286, 290 (N.D. Ill. 2019) (citations omitted); *Allstate*, 80 F. Supp. 3d at 879. But the "substantial event" test does

not require a showing that most of the events giving rise to the claims took place in the relevant district. Instead, events in the forum district are "substantial" if the plaintiff establishes the events "were part of the historical predicate for the instant suit" and have a "close nexus" to their claims. *Johnson v. Creighton Univ.*, 114 F. Supp. 3d 688, 696 (N.D. Ill. 2015) (quoting *Jackson v. N'Genuity Enters., Co.*, No. 14 C 2197, 2014 WL 4269448, at *6 (N.D. Ill. Aug. 28, 2014)). As explained above, SLM asserts that the DA Defendants targeted at least three of SLM's Illinois customers using SLM's misappropriated trade secrets; McKenna's affidavit does not rebut these those allegations. Moreover, SLM asserts that several of the Pfingsten Partners personnel driving the decision to hire Currie away from SLM—Finegan, Hessevick, and Lavelle—were operating out of Chicago while doing so; whether their conduct can be attributed to Diamond Assets for personal jurisdiction or liability purposes makes no difference to this venue inquiry. It may be that most of the events underlying this case took place in Wisconsin, where the DA Defendants are based, or in Ohio, where Currie and Finnegan-Ratliff live, but venue can be proper in more than one place, and this District need not be the "best venue" to be a suitable one. *Ford-Reyes*, 418 F. Supp. 3d at 290 (citations omitted). SLM has met its burden of establishing that venue is proper in this District.

## CONCLUSION

For the reasons explained above, the DA Defendants' motion [237] is denied. DA Defendants will answer the complaint within 28 days.

ENTER:

Dated: June 26, 2025

_____
REBECCA R. PALLMEYER
United States District Judge